**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BL SANTA FE, LLC, et al.[1] | ) | Case No. 21-11190 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Objections Due: October 8, 2021 at 4:00 p.m. EDT** |
| | ) | **Hearing Date: October 19, 2021 at 11:30 a.m. EDT** |
| | ) | **Re: D.I. 12 and 13** |

**OBJECTION OF RICHARD F. HOLLAND, HRV SANTA FE, LLC, AND HRV HOTEL PARTNERS, LLC TO CONFIRMATION OF THE CHAPTER 11 PLAN OF BL SANTA FE, LLC AND BL SANTA FE (MEZZ), LLC**

Richard F. Holland ("Holland"), HRV Santa Fe, LLC ("HRV Santa Fe"), and HRV Hotel Partners, LLC ("HRV Hotel") (collectively, the "Holland Parties"), by and through their undersigned counsel, hereby object (the "Objection") to the confirmation of the *Chapter 11 Plan of BL Santa Fe, LLC and BL Santa Fe (Mezz), LLC* ("Plan") [D.I. 12]. In support of this Objection, the Holland Parties respectfully state the following:

## I. INTRODUCTION

1. The Plan is the product of negotiations between the Non-Debtor Affiliates, the Senior Lender, and the Mezzanine Lender.[2] None of the Holland Parties participated in those negotiations. The purpose of the Plan is to permit the Mezzanine Lender to acquire the property without any marketing or competition. Indeed, the Debtors' filed these cases with an RSA predicated on a debtor-in-possession financing facility that required the Debtors to consummate

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: BL Santa Fe, LLC (4586) and BL Santa Fe (Mezz), LLC (1098). The Debtors' mailing address is 1297 Bishops Lodge Rd., Santa Fe, NM 87501.

[2] Capitalized terms not otherwise defined carry the same meaning ascribed to them in the Plan.

this sham sale within a matter of weeks. Proper fiduciaries would not have coupled the DIP facility with the DIP lender's Plan.

2. Mr. Andrew Blank pursued the resort for months prior to bankruptcy. *See* Transcript of September 23, 2021 Hearing (the "Tr.") (attached as Exhibit A), 31:13–34:1. The Debtors did not contact him to shop the DIP or the Plan. *Id.* Following the Petition Date, Mr. Blank put forward an objectively better plan with committed equity and debt financing, including a 0% interest unsecured DIP loan. *Id.* at 34:2–35:11. The Debtors ignored Mr. Blank's overtures.

3. At the second day hearing in these cases, the Debtors' president, Michael Norvet, first admitted the Debtors never would exercise a fiduciary out. *Id.* at 26:13–16. Then, the Debtors, through counsel, represented to this Court that they would evaluate any proposal from Mr. Blank. *Id.* at 63:22–24. Mr. Holland respectfully submits this has not occurred. Since the second day hearing, Mr. Blank has reaffirmed his proposal. However, the Debtors' engagement with Mr. Blank has been superficial. It appears that the Debtors have concluded that the current proposal is better because the Mezzanine Lender ***may*** be able to arrange for mortgage debt financing that is competitive with Mr. Blank's. This is an incredible assumption for any fiduciary to make given that the Mezzanine Lender has had months to obtain committed financing and has failed to do so. Simply put, no reasonable fiduciary would sacrifice the certainty of Mr. Blank's superior proposal with the current plan.

4. A reasonable fiduciary would have used Mr. Blank's proposal to push the Mezzanine Lender to improve its terms; these Debtors have not. A reasonable fiduciary would have communicated with equity participants how it concluded that the current Plan is superior to Mr. Blank's plan; these Debtors have not. While it is not entirely clear why these Debtors favor a

sale to the Mezzanine Lender, what is clear is that this preference has little, if anything, to do with maximizing value for equity holders.

5. The Plan provides for debtor BL Santa Fe (Mezz), LLC (the "Mezzanine Borrower") to convey its 100% membership interest in debtor BL Santa Fe, LLC (the "Senior Borrower") to a wholly owned subsidiary of the Mezzanine Lender (JBL HoldCo). *See Disclosure Statement Dated August 30, 2021 for Joint Prepackaged Chapter 11 Plan of BL Santa Fe, LLC and BL Santa Fe (Mezz), LLC* [D.I. 13] ("Disclosure Statement" or "DS") at 2. In exchange for that conveyance, the Mezzanine Loan will be satisfied in full, and the Senior Loan will be restructured. *Id.* The Plan purports to render all other claims unimpaired and consequently not entitled to vote on the Plan. *See* Plan at 15-16.

6. As the Plan's proponents, the Mezzanine Borrower and the Senior Borrower (collectively, the "Debtors") carry the burden of establishing the Plan's compliance with each of the requirements set forth in 11 U.S.C. § 1129(a).[3] See In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003). However, as set forth below, the Plan has fatal defects that preclude confirmation. Specifically, confirmation should be denied for the following reasons:

- *Plan's Non-Compliance with Bankruptcy Code (§ 1129(a)(1))*: The Plan contains an overbroad injunction provision that violates the Bankruptcy Code by (i) effectively releasing non-debtors of certain third-party liabilities on a non-consensual basis; and (ii) restricting the setoff and recoupment rights of creditors. Moreover, by altering the rights to which creditors would otherwise be entitled, the impairment caused by that injunction provision belies the Plan's designation of those creditors' underlying claims as unimpaired in violation of § 1124 and in derogation of creditor voting rights under § 1126.

- *Debtors' Non-Compliance with Bankruptcy Code (§ 1129(a)(2))*: By agreeing to proceed with the DIP Financing without eliciting, or even considering, any alternatives, the Debtors have violated the standards applicable to postpetition

[3] All references to statutory provisions are intended to be references to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), unless otherwise indicated.

financing under § 364 and they have essentially abdicated their fiduciary duties under the Bankruptcy Code.

7. For these reasons, as more fully set forth below, the Holland Parties object to the Plan's confirmation.

## BACKGROUND

### A. The Debtors' Case and their Business

8. On August 30, 2021 (the "Petition Date"), the Debtors commenced these cases by filing petitions under chapter 11 of the Bankruptcy Code.

9. The Debtors have remained in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10. The Debtors operate a luxury resort and hotel called Bishop's Lodge (the "Resort") located at 1297 Bishops Lodge Road, Santa Fe, New Mexico. DS at 31. The Senior Borrower acquired the Resort in late 2014 and closed it in mid-2015 to undergo extensive, property-wide redevelopment, renovations, and improvements. *Id.* Although the construction is still ongoing, the Resort completed a soft opening on July 1, 2021. *Id.*

### B. The Holland Parties

11. The Holland Parties were developers of the Resort. They also have a multitude of claims and interests at stake in the Debtors' cases. The following is a summary of the claims and interests of each of the Holland Parties:

(a) Holland: Holland, among other things, is a guarantor of both the Mezzanine Loan and Senior Loan. Consequently, he holds contingent claims against both Debtors.

(b) HRV Santa Fe: HRV Santa Fe owns an 8.5% interest in, and is manager of, non-debtor BL Santa Fe (Holding) LLC ("Holding"), which in turn owns a 100% interest in the Mezzanine Borrower.

(c) HRV Hotel: HRV Hotel is a creditor of the Senior Borrower, and it is party to that certain Development Agreement dated as of June 14, 2019 (the "Development Agreement") by and between the Senior Borrower and HRV Hotel. As described in the Objection of HRV Hotel Partners LLC to Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Related Procedures [D.I. 116], which is incorporated herein by reference, HRV Hotel also is a creditor of the Debtors, with claims amounting to $1,249,220.66.

## C. The Prepetition Litigation

12. The filing of the Debtors' bankruptcy case was preceded by the initiation of litigation between the Holland Parties and the other members of Holding, including most of the Non-Debtor Affiliates that negotiated the Plan with the Senior Lender and the Mezzanine Lender (collectively, the "Lenders"). A key issue in that litigation concerns the invalid attempt of the other members of Holding to remove Holland as its manager in contravention of Holding's operating agreement.

13. Purporting to act on behalf of the Debtors and Holding, those Non-Debtor Affiliates caused a demand for arbitration to be filed against Holland and HRV Hotel with the American Arbitration Association ("AAA"), seeking damages. Five days later, those Non-Debtor Affiliates caused an almost identical complaint to be filed in the New Mexico State Court of Santa Fe County ("New Mexico Court"), seeking injunctive relief.

14. On May 19, 2021, the New Mexico Court entered a preliminary injunction order (the "Injunction Order"). Among other terms, the Injunction Order stated the following:

> If a party to this lawsuit proposes to enter into an agreement with a third-party that would purport to bind one or more of the [Debtors and Holding] with respect to the financing for or construction or operation of the Bishops Lodge project, or any of the issues or subject of the Complaint, that party shall, before entering into such agreement, provide the third-party with copies of the Complaint and this Order, and inform the third-party of the existence of the dispute between the parties regarding the issue of who has authority to act for the [Debtors and Holding], and shall, no less than two business days before entering into such agreement, provide counsel for the other parties with a copy of such proposed agreement.

15. The Holland Parties have denied the claims asserted against them, and they have also asserted third-party claims against most of the Non-Debtor Affiliates and others in the AAA proceeding. Those third-party claims include claims for breach of fiduciary duty, defamation, and intentional interference with business relations. The Holland Parties also vigorously dispute the purported removal of Holland as manager of Holding.

**D. The Plan, the Disclosure Statement, and the DIP Financing Motion**

16. On the Petition Date, the Debtors filed the Plan and the Disclosure Statement. At the same time, the Debtors filed the *Debtors' Motion for Entry of Interim and Final DIP Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Financing Motion") [D.I. 10].

17. On the day following the Petition Date, this Court entered an interim order (the "Interim Order") granting the DIP Financing Motion [D.I. 51]. This Court subsequently entered an order scheduling a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan [D.I. 52].

18. On September 16, 2021, the Holland Parties filed an objection to the DIP Financing Motion [D.I. 64] ("DIP Financing Objection"). The DIP Financing Objection, which the Holland Parties hereby incorporate by this reference, describes the Debtors' failure to seek more favorable financing options and its specific refusal to acknowledge or entertain the Alternative DIP (as defined in the DIP Financing Motion) proposed by Andrew S. Blank. See DIP Financing Objection at pp. 3-9. The Alternative DIP[4] is a more favorable financing option in every respect

[4] Among other more favorable features, the Alternative DIP proposes financing on an unsecured basis. *See* 11 U.S.C. § 364(c) (providing that secured debt may only be incurred if unsecured debt is unavailable).

because it will fully fund administrative expenses, pay creditors in full, and provide additional liquidity to support the completion of the Resort's redevelopment, while also improving the prospects for a meaningful recovery to equity holders. Id.

19. The Plan, the Disclosure Statement, and the DIP Financing Motion are all products of negotiations between the Non-Debtor Affiliates and the Lenders. To memorialize their agreement on the material terms of the Debtors' restructuring process, the Non-Debtor Affiliates and the Lenders entered into the Restructuring Support Agreement ("RSA") on the day before the Petition Date. See DS at 1-2. A copy of the RSA is attached as Exhibit A to the *Declaration of Michael Norvet, President of the Sole Member of the Debtors, in Support of Debtors' First Day Motions* [D.I. 14]. The RSA incorporates by reference an associated restructuring term sheet as well as the DIP Financing Orders contemplated in the DIP Financing Motion. See RSA § 2 at p. 8 [D.I. 14 at 41 of 84].

20. In addition to spelling out the material terms of the Debtors' restructuring, the RSA spells out strict milestones for the entry of the DIP Financing Orders and the confirmation of the Plan. See RSA § 5(c) at pp. 15-16 [D.I. 14 at 48-49 of 84]. If those milestones are not achieved, extended, or waived, or if any DIP Financing Orders are entered in a form that is unacceptable to the Lenders in their sole discretion, the RSA is subject to termination. See RSA § 8(b)(ii),(ix) at pp. 19-20 [D.I. 14 at 52-53 of 84].

21. The RSA also provides for the Plan to include release and exculpation provisions in favor of its signatories to the fullest extent permitted by law. See RSA § 27 at p. 28 [D.I. 14 at 61 of 84]. Article VIII of the Plan sets forth those release and exculpation provisions. See Plan Art. VIII at pp. 34-37. Among those provisions is the following injunction provision (the "Injunction Provision"):

> D. Injunction
>
> Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

*See* Plan at p. 37 (emphasis omitted).

22. The Injunction Provision applies to all of the Debtors' creditors and interest holders. *Id.* Its scope not only extends to the Debtors and the Reorganized Debtors, but it also extends beyond them to include "the Released Parties." *Id.* Under the Plan, the "Released Parties" includes the Lenders, the Non-Debtor Affiliates, and each of their current officers, managers, employees and agents. *See id.*, § I(A)(89) at 9.

## II. <u>THE PLAN DOES NOT COMPLY WITH § 1129 OF THE CODE</u>

### A. The Plan Does Not Comply With The Bankruptcy Code.

23. A plan of reorganization cannot be confirmed unless it complies with applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Moreover, a plan may only include "appropriate provision[s] not inconsistent with the applicable provisions" of the Bankruptcy Code.

*See* 11 U.S.C. § 1123(b)(6). As set forth below, the Plan fails to comply with several sections of the Code, and it contains provisions that are inconsistent with the Code. Unless and until the Plan is modified in accordance with the Code, it cannot be confirmed.

**1. The Plan's Injunction Provision Is Overbroad and Impermissible.**

24. To the extent that the Plan contains any non-consensual third-party release provisions, they must be eliminated. The Bankruptcy Code vests no power in bankruptcy courts to grant a non-consensual third party release of a non-debtor. See In re Washington Mut., Inc., 442 B.R. 314, 354 (Bankr. D. Del. 2011); In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004). See also Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203, 213-14 (3d Cir. 2000) (declining to establish a rule governing conditions under which non-consensual third party releases would be permissible); In re Indianapolis Downs, LLC, 486 B.R. 286, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a debtor *upon consent* of the party affected.") (emphasis added); In re Spansion, Inc., 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan."). Cf. 11 U.S.C. § 524(e) ("Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

25. The Injunction Provision contains language that constitutes the functional equivalent of a nonconsensual third-party release. It purports to permanently enjoin all creditors and interest holders from taking almost any action against the "Released Parties," which include non-debtor parties such as the Lenders and all of the other signatories to the RSA. See Plan, § I(A)(89) at p. 9, § VIII(D) at p. 37. According to the broad sweep of the Injunction Provision,

any action against those Released Parties is permanently enjoined if is asserted "on account of or in connection with or with respect to any . . . Claims or Interests" against the Debtors. See Plan, § VIII(D) at p. 37.

26. To the extent that the Injunction Provision purports to permanently enjoin actions against non-debtors, this Court has no power under the Code to confirm it. Even if the Code did provide such power – through § 105(a) or otherwise – the Debtors have provided no basis whatsoever for this Court to conclude that the entry of a permanent injunction for the benefit of the non-debtor Released Parties satisfies the "exacting standards that must be satisfied if such releases and injunctions are to be permitted." See In re Millennium Lab Holdings II, LLC, 945 F.3d 126, 139 (3d Cir. 2019) (citing In re Global Indus. Techs., Inc., 645 F.3d 201, 206 (3d Cir. 2011 (en banc) (explaining that suit injunctions must be "both necessary to the reorganization and fair"); Cont'l Airlines, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]")) Consequently, the Injunction Provision renders the Plan unconfirmable.

**2. The Plan's Injunction Provision Violates § 553 and Improperly Restricts Setoff and Recoupment Rights.**

27. The Injunction Provision also purports to permanently enjoin creditors from "asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities" on account of their claims "unless such Holder has filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise[.]" See Plan, § VIII(D) at p. 37. This conditional prohibition upon setoff and recoupment rights is impermissible for several reasons.

28. First, it is an impermissible restriction upon the setoff rights that the Bankruptcy Code specifically preserves for creditors pursuant to § 553 of the Code. See Carolco Television Inc. v. Nat'l Broad. Co. (In re De Laurentiis Entm't Grp. Inc.), 963 F.2d 1269, 1276-77 (9th Cir.), cert. denied 113 S. Ct. 330 (1992) (noting that the language of § 553 "not only establishes a right to setoffs in bankruptcy…but seems intended to control notwithstanding any other provision of the Bankruptcy Code"); In re South Park Care Assocs. Inc., 203 B.R. 445, 447-48 (Bankr. W.D. Mo. 1996) ("The plain language of the Code in section 553, therefore, states that the right to offset a mutual debt is tempered only by the automatic stay of section 362, and the use, sale or lease of property as controlled by section 363."). See also IRS v. Luongo (In re Luongo), 259 F.3d 323, 333 (5th Cir. 2001) ("We agree with the vast majority of courts considering the relationship between § 524(a) and § 553 that a debtor's discharge in bankruptcy does not bar a creditor from asserting its right to setoff."). No legal basis exists for the Debtors to restrict setoff rights that are specifically preserved under § 553.

29. Even if setoff restrictions were otherwise legally permissible, the Plan's description and treatment of Secured Claims clearly contemplates the preservation of setoff rights and therefore contradicts any contrary Plan provisions that purport to strip creditors of their setoff rights. After all, setoff rights are specifically included within the Plan's definition of Secured Claim and are thereby carried within the definition of Senior Borrower Other Secured Claim. See Plan, § I(A)(97), (104) at p. 10;[5] *see also* 11 U.S.C. §§ 506(a) (claims subject to setoff under § 553 are secured claims to the extent of the amount subject to setoff). Moreover, the Plan provides that all classes of claims other than the Secured Claims of the Lenders are supposed to be Unimpaired. *See* Plan at 15-16. Setoff rights therefore cannot be restricted by virtue of the Injunction Provision.

[5] The Plan does not contain a specific definition or treatment of Mezzanine Borrower Other Secured Claims.

30. Likewise, the Injunction Provision cannot restrict creditor recoupment rights. No legal basis exists upon which the Plan can attempt to strip or restrict creditors in their assertion of recoupment rights. See Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 261-62 (3d Cir. 2000) (recoupment is a defense and not an interest that can be stripped in a § 363 sale); In re NII Holdings, Inc., 288 B.R. 356, 387 (Bankr. D. Del. 2002) (striking plan provisions that purported to strip recoupment rights). The Plan's impermissible restrictions on setoff and recoupment rights precludes its confirmation.

**3. The Plan's Designation of Non-Lender Claims as Unimpaired Violates § 1124 and Improperly Strips Those Claims of Voting Rights Under § 1126.**

31. Section 1124 of the Bankruptcy Code describes the limited circumstances under which a class of claims or interests is unimpaired under a plan. *See* 11 U.S.C. § 1124. In brief, under § 1124, a plan can leave a class of claims or interests unimpaired by either (i) not altering the legal, equitable and contractual rights of the claim or interest holders, or (ii) by curing defaults, reinstating maturity, compensating for damages, and not otherwise impairing the rights of the claim or interest holders. See COLLIER ON BANKRUPTCY ¶ 1124.01 (16th ed.). The determination of whether a class is unimpaired under § 1124 is an important question because only members of impaired classes can vote on a plan under § 1126. *Id.* See also 11 U.S.C. § 1126(a), (e).

32. The Plan only designates two Impaired Classes of Claims – Class 1 Senior Borrower Secured Claims and Class 6 Mezzanine Borrower Secured Claims. See Plan at 15-16. Notwithstanding the strict requirements of § 1124, the Plan improperly designates all of the other Classes of Claims as Unimpaired and inappropriately prohibits their holders (including the Holland Parties) from voting on the Plan. See id.

33. As described above, the Injunction Provision purports to alter the rights of non-Lender creditors by restricting their ability to take a multitude of actions "of any kind on account

of or in connection with or with respect to" their Claims, including the assertion of claims against non-Debtors and the assertion of rights of setoff and recoupment. See Plan, § VIII(D) at p. 37. That alteration of the rights of non-Lender creditors constitutes an impairment of their claims under § 1124 of the Code. The Plan's improper designation of the non-Lender Classes of Claims as unimpaired and its inappropriate elimination of corresponding voting rights are patent defects that preclude confirmation.

**B. The Debtors Have Not Complied With The Code (§ 1129(a)(2)).**

34. A chapter 11 plan may be confirmed only if the "proponent of the plan complies with the applicable provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 1129(a)(2). As stated in the DIP Financing Objection and outlined above, the Debtors executed and implemented the RSA and its contemplated financing without adequately considering any alternatives, including the Alternative DIP proffered by Mr. Blank. As a result, the Debtor has materially failed to comply with the Code, including § 364 of the Code, and the Plan therefore cannot be confirmed.

35. "In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate . . . ." In re Innkeepers USA Trust, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010). See also In re Bidermann Industries U.S.A., Inc., 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) (fiduciaries in chapter 11 must be aware that the conduct of bankruptcy proceedings not only should be right but must seem right). The Debtors' execution and implementation of the RSA, without consideration of other alternatives that offer a better return for the estate and all stakeholders, is an astounding failure to comply with the Code. By committing to the RSA and its tight milestones without reserving any meaningful ability to assess better alternatives, the Debtors unnecessarily sealed off the estate from the realization of its maximum value. That dereliction of duty to the estate and its stakeholders renders the plan unconfirmable.

36. Moreover, this failure to consider better alternatives persists to this day. The Debtors received Mr. Blank's competing proposal weeks ago, but have failed meaningfully to engage with Mr. Blank. Instead, for reasons that the Debtors fail to disclose, they are continuing forward with a flawed proposal without disclosing to constituents and mom and pop investors the existence of a proposal that would provide the likelihood of meaningful results for equity in the reorganized debtor.

## III. CONCLUSION

WHEREFORE, the Holland Parties respectfully request that this Court deny confirmation of the Plan and grant such other relief as is just.

Dated: October 8, 2021

**COZEN O'CONNOR**

/s/ Thomas M. Horan
Thomas M. Horan (DE Bar No. 4641)
1201 N. Market St., Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2045
E-mail: thoran@cozen.com

*Counsel to the Holland Parties*