**EXHIBIT A**

1
                   UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

2

                       .   Chapter 11
3
IN RE:                    .
                       .   Case No. 21-11190 (MFW)
4
BL SANTA FE, LLC, *et al.*,    .
                       .
5
                       .   Courtroom No. 4
6
                       .   824 North Market Street
                       .   Wilmington, Delaware 19801
7
                       .
               Debtors.   .   September 23, 2021
8
. . . . . . . . . . . . . . . . .   2:00 P.M.

9
           TRANSCRIPT OF TELEPHONIC SECOND DAY HEARING
            BEFORE THE HONORABLE MARY F. WALRATH
10
             UNITED STATES BANKRUPTCY JUDGE

11
TELEPHONIC APPEARANCES:

12
For the Debtor:         Matthew B. Lunn, Esquire
13
                   YOUNG CONAWAY STARGATT & TAYLOR, LLP
                   1000 North King Street
14
                   - and -
15
                   Frank J. Wright, Esquire
16
                   LAW OFFICES OF FRANK J. WRIGHT, PLLC
                   2323 Ross Avenue, Suite 730
17
                   Dallas, Texas 75201

18

19
Audio Operator:        Lesa Neal, ECRO
20
Transcription Company:  Reliable
21
                   1007 N. Orange Street
22
                   Wilmington, Delaware 19801
                   (302)654-8080
23
                   Email:  gmatthews@reliable-co.com

24
Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
25

1 | TELEPHONIC APPEARANCES (Cont'd):

2 | For Richard Holland:      Thomas Horan, Esquire
                             COZEN O'CONNOR LLP
3 |                          1201 North Market Street, Suite 1001
                             Wilmington, Delaware 19801
4 |
5 | For Juniper Bishops:      Christopher Bayley, Esquire
                             SNELL & WILMER LLP
6 |                          One Arizona Center
                             400 East Van Buren Street
7 |                          Suite 1900
                             Phoenix, Arizona 85004
8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1

MATTERS GOING FORWARD ON DISCOVERY DISPUTES:

2

Debtors' Motion for Entry of Interim and Final DIP Orders (I)
Authorizing the Debtors (A) to Obtain Post-Petition Financing

3

and (B) to Utilize Cash Collateral, (II) Granting Adequate
Protection to Prepetition Secured Parties, (III) Modifying the

4

Automatic Stay, (IV) Scheduling a Final Hearing, and (V)
Granting Related Relief [D.I. 10; 8/30/21]

5

   **Ruling:  63**

6

7

DEBTORS' WITNESS(s):

8

**MICHAEL NORVET**

9

      Direct Examination by Mr. Wright          10

10

      Cross Examination by Mr. Horan           19

11

      Redirect Examination by Mr. Wright       26

12

13

HOLLAND WITNESS(s):

14

**ANDREW BLANK**

15

      Direct Examination by Mr. Horan          29

16

      Cross Examination by Mr. Wright          43

17

      Redirect Examination by Mr. Horan        48

18

19

EXHIBITS                                 I.D.    REC'D

20

Exhibit A - Term Sheet                            34

21

Declaration of Andrew Blank                       50

22

23

24

25

1        (Proceedings commence at 2:0 p.m.)

2              THE COURT:  Good afternoon.  This is Judge

3    Walrath.  We're here in the BL Santa Fe case.

4              I will turn this over to counsel for the debtor.

5              MR. LUNN:  Good afternoon, Your Honor.  May I

6    please the court, Matthew Lunn from Young Conaway on behalf

7    of the debtor.

8              Referring to the agenda, Your Honor, we filed an

9    amended yesterday.  I hope Your Honor was able to see that.

10   And as reflected in that amended agenda items one through

11   five all related to first day related relief that was being

12   sought on a final basis.  All that relief has been entered by

13   Your Honor based on COC's or CNO's and we appreciate Your

14   Honor's attention to those matters.

15             The only matter that is going forward, then, today

16   is the DIP financing.  With respect to that I will cede the

17   podium to our co-counsel, Mr. Wright.

18             MR. WRIGHT:  Good afternoon, Judge.

19             THE COURT:  Good afternoon.

20             MR. WRIGHT:  With respect to -- this is agenda

21   item six and we're here on the final hearing on the debtor's

22   motion for entry of a final DIP order authorizing post-

23   petition DIP financing and use of cash collateral.  That

24   motion was filed at Docket No. 10.

25             At the first day hearing, on August 31st, the

1   court entered an interim order approving the DIP financing.

2   That was Docket 51.  We have had one objection filed by

3   Richard Holland and two of his entities.  That is at Docket

4   64.

5           Now through this motion the debtors are asking the

6   court to approve the DIP financing that is being provided by

7   the existing lenders and those lenders are: DB Bishops which

8   is the senior lender secured by a lien on the real estate and

9   a lender in the BL Santa Fe entity; then Juniper Bishops

10  which is the mezzanine lender and they are secured by an

11  ownership interest in BL Santa Fe, and their loan is at the

12  BL Santa Fe entity.

13          We're asking the court to approve that financing

14  on a final basis.  The financing will provide the funds

15  needed to cover the ongoing cost of construction of this

16  resort, to get it completed, and also the cost of

17  administration of the bankruptcy cases.

18          The terms of the financing are relatively

19  straight-forward.  Each lender is financing under their

20  existing prepetition loan documents.  So we don't have a new

21  set of DIP loan documents involved in this case like we

22  usually do.  They are making their loans at their prepetition

23  interest rates.  In the case of Juniper Bishops the financing

24  is in an amount up to $5,858,670.  In the case of DB Bishops

25  it is up to $2,644,512 and that loan only comes into play if

1  needed, if they exceed the $5.8 million.

2          The loans are secured by liens on each lenders'

3  existing collateral.  There is no crossing between these

4  loans.  Each lender is also receiving a superpriority

5  administrative claim. We have a confirmation hearing set in

6  this case on October 7th and closing is expected shortly

7  thereafter.  So these are very short term loans.

8          The motion is supported by the debtors, by the

9  senior lenders, the mezzanine lender and by over 90 percent

10  of the owners of BL Santa Fe (Holding) which is the entity

11  that owns the BL Santa Fe (Mezz) entity which in turn owns

12  100 percent of BL Santa Fe.

13          As I said, the only objection filed is by Richard

14  Holland and two of his entities.  Now Mr. Holland he's a

15  guarantor on the debt to each of these prepetition lenders as

16  well as our other members of the holding entity.  He is also

17  the owner of two entities:

18          HRV Santa Fe which holds an interest in Holding.

19  Its interest, he says, is 8 and a half percent, the other

20  members say it may be less than 5 percent, but at any rate is

21  under 10 percent.

22          HRV Hotel Partners was the developer on the

23  project, they were terminated as developer.  And as the court

24  is aware we have a receiver in place, the receiver is using a

25  construction company and the project is being completed.

1            The Holland party's objection is supported by one

2   declaration and that is by a guy named Andrew Blank.  He is

3   not a creditor in this case.  He is not a party in interest

4   in the case, but he is proposing, through the Holland

5   parties, an alternative DIP proposal.  In reality, though,

6   Judge, as you can tell from reading their objection, it is an

7   alternative plan proposal, not a DIP proposal.

8            What they are trying to apparently do today is

9   turn this into a confirmation hearing instead of a final

10  hearing on a DIP.  If you look at page 5 of their objection

11  it's a comparison of exit financing, not DIP financing.  The

12  only DIP financing terms are found on page 6 which states

13  that the amount and type will be substantially similar to the

14  DIP loan that we have in place and the budget will be

15  substantially similar to the DIP loan that we have in place,

16  but that Mr. Blank will charging a 1 percent upfront fee and

17  then he's going to charge zero interest on a non-default rate

18  at 15 percent on a default rate.

19          Keep in mind that this is a DIP hearing, it's not

20  a confirmation hearing.  The debtors have analyzed and looked

21  at these proposed terms and the debtors, after evaluating the

22  proposal have determined that in their best business judgment

23  they should proceed with the motion on file.  That is keeping

24  in mind several factors:

25              One, the cost of switching horses at this point,

1   changing lenders and coming up with a new set of loan

2   documents, filing new motions, new (indiscernible).  The

3   limited benefit of a lower interest rate when you have a very

4   short term loan in place.  The fact that the interest that is

5   accruing on the mezzanine loan is going to be converted to

6   equity under the plan anyway.  The risk of losing the

7   benefits of the plan that is on file that is already

8   supported by both lenders and the majority of the equity

9   holders.

10          So the debtors have made the decision on the basis

11  also of their positive prepetition lending relationship with

12  both lenders.  What the testimony will show today is that

13  Juniper Bishops, the mezzanine lender, stepped up and has

14  been funding the cost of getting this construction finished.

15  There has been a very good ongoing working relationship

16  between the debtors and these lenders.

17          There is a preference by the debtors to not engage

18  in litigation with them.  Mr. Blank would like to engage in

19  litigation with them over their exit fees.  The debtors are

20  more focused on exiting bankruptcy quickly, getting a plan

21  confirmed quickly and getting this resort out of bankruptcy.

22  Mr. Blank, as I noted, has offered to fund litigation against

23  Juniper Bishops over its exit fee, but the debtors want to

24  exit and not be held down in litigation.

25          I would ask the court to include in today's

1  evidence the record that was already made at the first day

2  hearing and in particular their first day declaration of

3  Michael Norvet, the president of the debtor, and that's at

4  Docket 14.

5          With that, unless the court, would rather hear

6  from other parties, I'd be prepared to call Mr. Norvet as my

7  first witness.

8          THE COURT:  Well, first, does anybody object to

9  the admission of Mr. Norvet's first day declaration?

10         MR. HORAN:  Your Honor, Thomas Horan for the

11 Holland parties.  We don't object, but we do wish to cross-

12 examine.

13         THE COURT:  Alright, well subject to your right to

14 cross-examine then -- well, let's get the testimony in and

15 then I will hear your side of the story.

16         Mr. Norvet, is he here?  If he can just say

17 something so he pops up on the screen.

18         MR. WRIGHT:  Michael?

19         MR. NORVET:  Can you hear me now?

20         THE COURT:  Yes.

21         MR. NORVET:  I'm sorry. I had you on mute.  I

22 apologize.

23         THE COURT:  I'm going to ask the clerk to

24 administer the oath to you.  We don't have you on video, do

25 you have a video, Mr. Norvet?

1    MR. NORVET:  Yes, I do.  I don't know why it's

2 not.  Is that coming through?

3    MR. WRIGHT:  No.

4    THE COURT:  No.

5    MR. NORVET:  Let me try this again.  Can you see

6 me now?

7    MR. WRIGHT:  I see you now.

8    THE COURT:  Now we see you.  Alright, I will ask

9 you to raise your hand and as Ms. Neal to give you the oath.

10    MICHAEL NORVET, DEBTOR WITNESS, SWORN

11    THE CLERK:  Please state your full name and spell

12 your last name for the record.

13    THE WITNESS:  Michael Norvet, N-O-R-V-E-T.

14    THE COURT:  Alright.

15    DIRECT EXAMINATION

16 BY MR. WRIGHT:

17 Q    Mr. Norvet would you state your relationship to the

18 debtors?

19 A    I am the president of the debtors and I'm also the

20 president of BL Santa Fe (Holding).

21 Q    And how long have you held those positions?

22    (No verbal response)

23 Q    Did you hear me?

24    THE COURT:  It's locked.

25    THE WITNESS:  From December 2020.  Can you hear me

1 | now?

2 |     MR. WRIGHT:  Yes.

3 | BY MR. WRIGHT:

4 | Q How long have you been involved with the debtor's

5 | business involving this resort in Santa Fe, New Mexico?

6 | A Since January 2017.

7 | Q And in what capacity?

8 | A I have a carried interest in the general partner of

9 | Evolution RE Bishops Lodge, LP which is the largest equity

10 | holder of BL Santa Fe (Holding).

11 | Q And what interest, roughly, does it hold in BL Santa Fe

12 | (Holding)?

13 | A Approximately 65 percent.

14 | Q Alright, and when I'm talking to you today the entity

15 | that owns the property is BL Santa Fe, correct?

16 | A Correct.

17 | Q And the entity that owns that is BL Santa FE (Mezz),

18 | right?

19 | A That's correct.

20 | Q If I just refer to it as Mezz you will understand what

21 | I'm talking about?

22 | A Yes, I will.

23 | Q Okay.  Then the entity that owns the BL Santa Fe (Mezz)

24 | entity is BL Santa Fe (Holding), correct?

25 | A Correct.

1  Q     And we can just refer to it as Holding?

2  A     Correct.

3  Q     And so as you just said the largest investor in Holding

4  is the Evolution RE Bishops Lodge, LP entity?

5  A     Correct.

6  Q     And that is the entity that you are involved with?

7  A     That is correct.

8  Q     So on behalf of that entity which has the largest

9  equity stake you -- would you say that you have a definite

10 interest in making sure that it is getting the best deal --

11 that you are getting the best deal for the creditors and the

12 equity in this case?

13 A     Yes.

14 Q     And you executed the declaration in support of the

15 debtor's first day motions, correct?

16 A     Yes, I did.

17 Q     And do you still stand by that testimony?

18 A     Yes, I do.

19 Q     Mr. Norvet, can the debtor's fund their operations and

20 the restructuring expenses of these Chapter 11 cases without

21 borrowing additional money?

22 A     No, they cannot.

23 Q     The debtors don't have any other source of liquid

24 assets in order to fund expenses.  Is that right?

25 A     That's correct.

1  Q     So is borrowing money necessary to preserve the

2  debtor's assets?

3  A     Yes.

4  Q     What are the general terms of the DIP facility that the

5  debtors have proposed and asked the court to approve?

6  A     With regard to Juniper its $5.8 million.  With regard

7  to DB Bishops its $2.6 million.  Both of those are under the

8  terms of the existing facilities prepetition lending and

9  under the current documents.  And they're secured by each

10 existing -- the existing collateral of each loan.

11 Q     And do you recall, roughly, what the interest rate is

12 on the Juniper loan?

13 A     Yes.  Its roughly 17 percent.

14 Q     And how about the interest rate on the DB Bishops loan?

15 A     11 percent.

16 Q     In your opinion are those interest rates market rates

17 for construction loans?

18 A     In my opinion, yes.

19 Q     Will the debtors be able to continue to fund their

20 operations and restructuring expenses if the DIP facility is

21 not approved?

22 A     No.

23 Q     So in your opinion is the approval that is being sought

24 today necessary in order for the debtors to be able to

25 advance their cases and get information?

1  A    Yes, it is.

2  Q    Now at the time of the bankruptcy filing were you aware

3  of any other viable alternative to the DIP facility that is

4  before the court?

5  A    No, I was not.

6  Q    Did you solicit any other DIP financing proposals prior

7  to filing?

8  A    No, we did not.  We felt like if there was -- if we did

9  there would be a priming issue with existing lenders, so we

10 chose not to.

11 Q    And the existing lenders have liens on all of the

12 assets.  Is that correct?

13 A    Yes.

14 Q    Now are you aware that Mr. Holland, and HRV Santa FE,

15 and HRV Hotel Partners have objected to the DIP financing?

16 A    Yes, I am.

17 Q    Now how is Mr. Holland involved with the property?

18 A    Mr. Holland owns, through one of his entities, between

19 5 and 8 percent of Holding, the equity in Holding.  He also,

20 through one of his entities, was the developer, but he has

21 since been terminated.

22 Q    Have you reviewed the Holland party's objection?

23 A    Yes, I have.

24 Q    And after considering what is set forth in that

25 objection is it still your opinion that the debtors should go

1  forward with the current DIP facility on file before the

2  court?

3  A     Yes, it is.

4  Q     In your opinion does the alternative DIP financing that

5  is being offered by Mr. Blank and being promoted by the

6  Holland parties contain better terms --

7  A     No, it doesn't.

8  Q     -- for the debtors.

9  A     Excuse me.  No, I do not.

10  Q     Why not?

11  A     Well I think that acceptance of the DIP proposal would

12  require that we negotiate an entire restructuring proposal

13  that would add additional time and expense to the bankruptcy.

14  I also think it would prolong in terms of time exit from

15  bankruptcy.  We're trying to do this in a relatively short

16  period of time.

17         It would also put the debtors in a contested situation

18  because I understand, under the terms of the alternative DIP

19  proposal, there would be a requirement for a second lien

20  which would be a priming issue that we would have a

21  difficulty overcoming.

22         I guess finally, we have had a long relationship with

23  Juniper with regard to this project.  They have funded

24  millions of dollars outside of their loan agreement in order

25  to continue construction of the resort.  For us that is an

1  important trust factor that we have with the existing

2  lenders.

3  Q    Do you believe there would be any other added risk if

4  the debtors were to opt for the alternative DIP facility

5  proposed by the Holland parties over the proposed financing

6  that is before the court?

7  A    Yes.  I think we would have a risk of whether or not we

8  could complete a restructuring proposal to exit the filing or

9  the bankruptcy if we chose that alternative financing.

10 Q    And what liens are you -- do you understand are being

11 proposed under the alternative DIP facility?

12 A    There's a second lien on the property.

13 Q    So that would be a lien that would come junior to the

14 lien of DB Bishops.  Is that right?

15 A    That's correct.

16 Q    Effectively it would put it as a lien ahead of Juniper.

17 Is that right?

18 A    That is correct.

19 Q    Juniper, under the DIP financing before the court, does

20 not get a lien on the real estate, right?

21 A    That's correct.

22 Q    What about the zero percent interest rate that is being

23 offered in this Blank DIP financing.  Does that make that

24 alternative DIP better in your opinion?

25 A    No, it does not for the very reason that we have to

1  negotiate -- it required additional expenses to negotiate

2  documents during that period of time.  So, no, I do not

3  believe that it would ultimately be a better deal.

4        In addition to that I would note that the interest paid

5  under the DIP facility with Juniper is capitalized in the

6  equity, preferred equity upon exit.

7  Q    So, effectively, if the plan ultimately is approved at

8  the confirmation hearing then that interest just gets

9  converted to equity, right?

10 A    That is correct.

11 Q    Is a part of the factor here, in your opinion, on the

12 interest rates is a short term of the DIP financing?

13 A    Yes.  I mean it's a relatively short period of time and

14 the total interest cost would not be material given the

15 additional expenses that we would have to incur.

16 Q    Now are you on the board of the Holding entity?

17 A    Yes, I am.

18 Q    Who else is on that board of managers?

19 A    The other equity holders would include Nunzio DeSantis,

20 Alec Walter, Brad Brooks.

21 Q    And between the group of you approximately what portion

22 of the equity of Holding do you all represent?

23 A    Again, roughly, 95 to -- 92 to 95 percent of the

24 equity.

25 Q    And what is the position of the board of managers of

1  Holding with respect to the DIP financing that is before the

2  court today?

3  A     That we need to accept the current plan, current DIP

4  facility.

5  Q     Now there is also a Mr. David Mack who was appointed as

6  the independent director.  Is he in favor of the DIP

7  financing that is before the court today?

8  A     Yes.  To my knowledge he is.

9  Q     Have you had numerous meetings with Mr. Mack and the

10  board?

11  A     Yes.

12  Q     And so are the entire board and Mr. Mack unanimously in

13  favor of having the financing that has been proposed to the

14  court approved today?

15  A     Yes.

16  Q     Anything else you want to add as to why you think the

17  financing before the court is better than the proposal from

18  Mr. Holland?

19  A     I think we have covered most of it. I would just re-

20  emphasize the fact that we have had a long relationship with

21  Juniper.  They have done everything that they have said they

22  would do and for us there is a trust factor there that we

23  feel is important in the overall aspect of this.

24       We have covered the additional expense that we think we

25  would have to incur and so I would leave it at the fact that

1  based upon all those components we unanimously favor the

2  current DIP facility.

3  Q    If you would tell the court what the debtors did in

4  order to (indiscernible) the alternative DIP financing

5  proposal?

6  A    We had numerous meetings, discussions, conversations

7  with regard to the alternative and looking at all aspects of

8  it, numerous calls, teleconferences and so forth.

9          MR. WRIGHT:  I will pass the witness.

10          THE COURT:  Mr. Horan?

11          MR. HORAN:  Yes.  Good afternoon, Your Honor.

12                    CROSS EXAMINATION

13  BY MR. HORAN:

14  Q    Good afternoon, Mr. Norvet.

15  A    Good afternoon.

16  Q    In your first day declaration you stated that the

17  belief it would have been highly unlikely if not impossible

18  to obtain post-petition financing from third parties.  Why

19  did you believe that to be true when you executed the

20  declaration on August 30th?

21  A    I'm sorry, I need to turn this up, I didn't hear the

22  question.

23  Q    I will repeat that.  In your first day declaration, Mr.

24  Norvet, you stated that the debtors believed it would have

25  been highly unlikely, if not impossible, to obtain post-

1  petition financing offers from third parties in light of the

2  current state of the hotel's operations.  Why did you believe

3  that to be true when you executed the declaration on August

4  30th?

5  A    Because the hotel was under construction at that time

6  and it would have been difficult to find alternative

7  financing at that point.

8  Q    And you know who Andrew Blank is?

9  A    I do.

10 Q    And do you recall when you first became aware of Mr.

11 Blank?

12 A    It was January of 2021.

13 Q    And he sought to purchase the company at auction,

14 didn't he?

15 A    That is correct.

16 Q    So why wouldn't you have approached Mr. Blank given his

17 interest?

18 A    Well because he spent most of the last four or five

19 months attempting to purchase the property at foreclosure

20 which would have eliminated all the equity positions in the

21 company.

22 Q    So in other words you didn't want to do business with

23 him?

24 A    We didn't particularly care for his approach to it in

25 that it would have eliminated our position in the company.

1  Q    Have you reviewed the proposal that Mr. Blank provided?

2  A    Yes, I have.

3  Q    Do you feel like you're familiar with the terms?

4  A    For the most part, yes.

5  Q    And would this proposal wipe out equity?

6  A    The current proposal would not.

7  Q    Did you to talk to anyone other than Juniper about

8  financing a DIP and doing restructuring transactions?

9  A    No.

10  Q    And, again, why not?

11  A    Because we felt like the current DIP facility or the

12  position of Juniper would get us to the end of construction,

13  opening of the resort and to the complete construction.

14  Q    How would you know if the Juniper deal is the best deal

15  available if it hasn't been exposed to the market?

16  A    I don't really know.

17  Q    Do you think that is something that you should know

18  given the declaration that you've signed?

19  A    I think given the timeframe that we're working under it

20  would be difficult to do.

21  Q    Did you perform any analysis on this proposal yourself?

22  A    Yes.

23  Q    And what sort of analysis did you perform?

24  A    We did a cost comparison.  We did, as I said, numerous

25  teleconferences.  Primarily did a cost comparison between the

1  two.

2  Q    And what was the result of that cost comparison?  Can

3  you walk me through that, please?

4  A    We determined, at that time, that the current DIP

5  proposal was, in fact, a better transaction for us in the

6  long term through restructuring.

7  Q    I appreciate that answer, but it's not precisely

8  responsive to my question.  Can you talk about what the

9  differences were in the cost with any specificity?  I want to

10  understand what the results were that you came to.

11  A    Well there were numerous exit fees and so forth that

12  would have been required under the Blank proposal that would

13  not be required under the existing DIP facility.  There were

14  additional expenses that would be required to document a new

15  facility that we have already incurred with the current DIP

16  facility.  So we did analysis on each one of those.

17  Q    You are aware that you proposed a zero (indiscernible)?

18  A    Yes.

19  Q    And is zero percent less than 6 percent?

20  A    Yes, but that is not what we're being asked to analyze.

21  Q    Okay.  That was the question that I asked you.

22       In fact, Mr. Blank is proposing no exit fee, but the

23  Juniper facility has a 10 percent exit fee, right?

24  A    It does for -- yes.

25  Q    And no exit fee is better than a 10 percent exit fee

1  under most circumstances?

2  A    Yes.

3  Q    Have you -- you testified that you talked with the

4  board about the existence of Mr. Blank's proposal?

5  A    Correct.

6  Q    And what did you tell the board about it?

7  A    I shared the proposal with the members of the board,

8  with the independent director. They were all aware of it.

9  They all reviewed it?

10 Q    And how did they respond to it?

11 A    In the same manner as I discussed earlier.

12 Q    Talk about the overwhelming acceptance of the

13 prepackaged plan.  Investors didn't have a chance to consider

14 the Blank proposal before they voted on the prepackaged plan,

15 did they?

16 A    No.

17 Q    They just voted yes or no on Juniper?

18 A    Correct.

19 Q    So equity didn't, in fact, consider two alternatives in

20 choosing one over the other, correct?

21 A    Correct.

22 Q    It was take it or leave it?

23      (No verbal response)

24 Q    Did the debtors ask Mr. Blank if he would be willing to

25 do a standalone DIP?

1   A       (Indiscernible).

2   Q       Did the debtors ask Mr. Blank if he would be willing to

3   do a standalone DIP; in other words, a DIP without a

4   restructuring?

5   A       No.  Not that I am aware of, no.

6   Q       And why not?

7   A       It just never came up.

8   Q       If you ruled out the possibility of Mr. Blank providing

9   a DIP is his proposal still under consideration in so far as

10  it proposes a restructuring of the business?

11  A       I would say, yes.

12  Q       Are you aware that on September 21st your counsel wrote

13  to Mr. Blank's attorney, copied me on it and said that the

14  debtors rejected Mr. Blank's proposed terms, have they?

15  A       No, not that I am aware of.

16  Q       You didn't negotiate with Mr. Blank over this?

17  A       Not that I am aware of.

18  Q       Are you concerned that the Juniper financing only

19  brings the debtors through December 31st?

20  A       No because I believe there is opportunities to

21  refinance or to find alternative financing.

22  Q       And who do you think you would be able to refinance

23  through?

24  A       I have no idea at this point but I do believe that it's

25  an option.

1  Q     So it's fair to say that you are uncertain about where

2  financing is coming from after December 31st?

3  A     At this point, yes.

4  Q     Now Mr. Blank is proposing (indiscernible) to

5  financing.  Doesn't that give greater certainty for years to

6  come?

7  A     Yes.

8  Q     And you wouldn't have to shop for new financing for

9  years if you were to go along and adopt the Blank proposal,

10 correct?

11 A     Correct.

12        MR. WRIGHT:  Judge, I'm going to object to the

13 line of questioning.  We are going into exit financing which

14 is the subject of a confirmation hearing.  We have strayed

15 away from the DIP financing before the court today.

16        THE COURT:  Yeah I think that's true, Mr. Horan.

17 I will sustain the objection.

18        MR. HORAN:  May I briefly respond to it, Your

19 Honor?

20        THE COURT:  You may.

21        MR. HORAN:  Thank you.  IN their papers and from

22 the testimony we heard today what we keep hearing is that the

23 plan proposal is already locked in and the DIP is important

24 to that.  They are not going to consider another DIP because

25 it's integral to the plan transaction.  So I think its not --

1 || granted this is not a plan confirmation hearing, but I think

2 || these issues are in play today?

3            THE COURT:  Alright, I will give you some leeway.

4 || BY MR. HORAN:

5 || Q    Does the restructuring support agreement that is

6 || presently being proposed contain a fiduciary out?

7 || A    Can you ask that again, please?

8 || Q    Does the restructuring support agreement that the

9 || debtor is presently proposing and that's been voted on, does

10 || that contain a fiduciary out?

11 || A    I'm not certain.  I can't answer that.

12 || Q    It's mentioned in the reply brief that your company

13 || filed yesterday.  But given your testimony today about cost,

14 || and uncertainty and all that do you think you would ever

15 || exercise a fiduciary out?

16 || A    No.

17 || Q    Mr. Norvet isn't it true that last year you were

18 || suspended by (indiscernible) for transactions regarding or

19 || relating to this reply?

20 || A    That is correct.

21            MR. HORAN:  I have no other questions, Your Honor.

22            THE COURT:  Any redirect?

23            MR. WRIGHT:  Yes, just a little bit.

24                      REDIRECT EXAMINATION

25 || BY MR. WRIGHT:

1  Q     Mr. Norvet, you were asked about Mr. Blank and the

2  history of dealing with him.  I think you said that he

3  attempted to buy the property at auction.  Is that right?

4  A     That is correct.

5  Q     And was that on several occasions?

6  A     Yes.

7  Q     And prior to the bankruptcy filing were you aware of

8  any proposal by Mr. Blank that would have resulted in any

9  payments to any equity holders --

10 A     No.

11 Q     -- above and beyond the creditors.

12 A     No, I'm not.

13 Q     With respect to the questioning that you were asked

14 about whether or not you had shopped the deal prior to the

15 bankruptcy filing why didn't the debtors pursue financing

16 outside of Juniper?

17 A     We were, at the time, still under construction.

18 Juniper offered to advance -- protective advances to complete

19 the resort and to open the resort on a timely manner.  We

20 felt like that was the best alternative for us to get the

21 resort open.

22 Q     It was also a concern of yours that any other lender

23 would want to prime the existing liens?

24 A     Ask me that again, please, I'm sorry.

25 Q     Was it also a concern that other lenders would want to

1  prime the existing creditors?

2  A     Absolutely.

3  Q     And, in fact, that is what Mr. Blank had proposed here

4  is he wants to prime Juniper by putting a second lien on the

5  real estate, correct?

6  A     That is correct.

7  Q     Now with respect to the exit fees those are only

8  payable if you pay off the debt and you don't go forward with

9  a plan that converts the debt to equity, correct?

10  A     That is correct.

11  Q     Is it your understanding that even if the court

12  approves the financing today that the debtors still have the

13  ability to either do the plan that is on the table or do a

14  different plan as promulgated by the Holland parties?

15  A     Yes, that is correct.

16  Q     In fact, what was rejected was the DIP financing

17  proposed by the Holland parties, not a restructuring plan

18  proposal.  Is that correct?

19  A     That is correct.

20            MR. WRIGHT:  That is all I have.

21            THE COURT:  Any re-cross?

22            MR. HORAN:  No, Your Honor.

23            THE COURT:  Thank you, Mr. Norvet.  You are

24  excused.

25            THE WITNESS:  Thank you, Judge.

1          (Witness excused)

2               MR. WRIGHT:  Judge, that concludes our evidence.

3               THE COURT:  Mr. Horan, do you have any evidence?

4               MR. HORAN:  Yes.  In support of our case we would

5    like to call Mr. Blank to testify.

6               THE COURT:  Alright, I will ask him to say

7    something so that he can be sworn.

8               And I will ask Mr. Norvet to mute his line now.

9               THE COURT:  Mr. Blank?

10              MR. BLANK:  Good afternoon, Judge.

11              THE COURT:  Alright, I will ask the clerk to give

12   you the oath.

13                    ANDREW NORVET, WITNESS, SWORN

14              THE CLERK:  Please state your full name and spell

15   your last name for the record?

16              THE WITNESS:  Andrew Scott Blank, B-L-A-N-K.

17              THE COURT:  You may proceed, Mr. Horan.

18                        DIRECT EXAMINATION

19   BY MR. HORAN:

20   Q    Good afternoon, Mr. Blank.

21        You executed a declaration in connection with the

22   Holland party's objection to the financing DIP proposal,

23   haven't you?

24   A    Yes.

25   Q    And is your testimony in the declaration that you made

1  still true?

2  A     Yes, it is.

3  Q     Can you please introduce yourself to the court by

4  telling us about your background and what you do for a

5  living?

6  A     I am 65 years old.  I'm happily married to an amazing

7  wife.  We have one daughter together who proudly just took

8  the California Bar exam.  I am Miami born and raised.  I am a

9  business exec and entrepreneur with fairly broad exposure and

10  experience.  I was the worlds' largest beer wholesaler,

11  Anheuser-Busch's largest wholesaler.  I'm in the software

12  development business. I owned and operated multiple money

13  management firms.

14      I was a large shareholder, majority shareholder with a

15  childhood friend of mine of the nation's largest Spanish

16  language radio broadcasting company.  I was in the television

17  programing business through a company called Video TubeBox

18  Network which was ultimately acquired by MTV.  I'm in the

19  commercial warehousing business and real estate investment

20  business.

21      I am president of the Blank Family Foundation,

22  philanthropic private foundation that's distributed, give or

23  take, $50 million to the underserved, elderly, youth,

24  medically challenged populations.  I served for 12 years or

25  so on the Florida Public Service Commission Nominating

1  Council as chairman.  I was appointed by the Florida senate

2  president and reappointed by subsequent presidents of both

3  political parties.

4        I chaired the foundation the nation's largest community

5  college.  I serve on the board of privately held non-opioid

6  pain management company.  I am chairman of the board of a

7  publicly held company in the heart failure space, also

8  biomed.  I serve on a bank board.  I'm on the executive

9  committee of the Greater Miami Jewish Federation.  I am a

10 founder of the Park City Community Foundation and served for

11 many years on the board of a major hospital in Miami.

12 Q     Thank you.

13       Mr. Blank, how did you become aware of Bishops Lodge?

14 A     A friend of mine, Jerry Peters, who is very much

15 involved in Santa Fe, owns a bank there, owns a half a dozen

16 or so restaurant operations, owns the major art gallery in

17 town, has -- I call him Mr. Santa Fe.  He's very much

18 involved in the fabric of the Santa Fe market.  He was aware

19 of Bishops Lodge and their struggles to complete and cost

20 overrun, so on and so forth.  The fact that they needed help

21 to progress the project to the level that was envisioned.  So

22 I agreed to come out and visit and see the property, and make

23 a determination as to whether or not I had an interest in

24 investing there.

25 Q     Did you determine that you did have an interest?

1  A      Yes, I did.

2  Q      What was attractive about it?

3  A      I'm sorry?

4  Q      What was attractive about Bishops Lodge?

5  A      Well, one, I had close connections, as I mentioned, to

6  the Santa Fe business community.  I liked very much the look

7  and feel of the project. I felt like if we did it right, you

8  know, we could turn what was a very challenging situation

9  where the partners were at each other's throats and the focus

10  was not where it needed to be.

11        Success of the project was very much in doubt. I

12  thought that we could, you know, bring it back to life, make

13  it work the way it was intended.  I felt it was a legacy

14  investment for my family.

15  Q      Now you intended to bid on auction for the assets.

16  What were the broad outlines of your intended bid?

17  A      I would have bid an amount sufficient to pay both the

18  mezzanine lender and senior lender in full.  On multiple

19  occasions, the mezzanine lender and mortgage lender were made

20  aware of that fact.

21  Q      And, apart from the lenders, to who else did you

22  present these terms?

23  A      To the equity holders of the debtor and also to the

24  receiver that was appointed by the senior lender; no

25  surprise, I think any party to the transaction that I was

1  interested in acquiring the property.

2  Q    And did your proposal include a loan component?

3  A    I'm sorry?

4  Q    Did your proposal include a loan component?

5  A    Yes, it did.

6  Q    Could you tell me about that, please?

7  A    Well, the mezzanine lender put off its sale process on

8  numerous occasions, in fact four occasions, actually, each of

9  which I was registered and qualified to bid that.  That

10 resulted in extra interest in claimed fees, and so on and so

11 forth, but I ended up offering an zero percent interest loan

12 pending court approval of an auction process.

13 Q    And, to your knowledge, before the bankruptcy case was

14 filed was the management of these debtors aware of your

15 proposals?

16 A    A hundred percent.  I had numerous conversations with

17 them about the contours of the recapitalization proposal on

18 the property.

19 Q    And, knowing of your interest and your wherewithal,

20 before the bankruptcy case was filed, did the debtors'

21 management approach you about the possibility of you

22 providing debtor-in-possession financing in these cases?

23 A    They did not.

24 Q    And did they solicit you about entering into a

25 restructuring support agreement either?

1  A      No, they did not.

2  Q      And at the time that the bankruptcy case was filed, had

3  you presented an offer to the debtors to provide financing?

4  A      I did, through my attorney to both debtors' counsel and

5  Mr. Mack, the independent director.

6  Q      Now, there was a term sheet attached to your

7  declaration, is that the offer that you presented to the

8  debtors?

9  A      Yes, it is.

10          MR. HORAN:  Your Honor, I'd like to move the term

11 sheet attached as Exhibit A to Mr. Blank's declaration into

12 evidence?

13          THE COURT:  Any objection?

14          MR. WRIGHT:  I guess I would object to the

15 relevance of it because it is not a DIP financing proposal,

16 it's an alternative restructuring proposal, and that's a

17 confirmation issue.

18          THE COURT:  Well, you can raise that later, but

19 any objection to that at least being part of the record?

20          MR. WRIGHT:  No.

21          THE COURT:  All right, I will admit it.

22      (Exhibit A received in evidence)

23 BY MR. HORAN:

24 Q      And, broadly speaking, what does the term sheet

25 provide?

1  A      It provides an alternative restructuring, a proposal

2  that contains a DIP financing at zero percent interest from

3  entities that I control, and it includes repayment of the

4  mortgage, debtors' mortgage, the mezzanine loans, the third

5  party mortgage debt that I'd arranged from my entities.

6  Q      And, sitting here today, are you still prepared to

7  consummate that transaction if the debtors said yes?

8  A      Yes.  I mean, I have not protracted the proposal.  I

9  clearly remain prepared to complete the transactions, you

10 know, included -- including the zero percent DIP loan in my

11 proposal.

12 Q      And did you do anything to demonstrate to the debtors

13 that you have the ability to consummate those transactions

14 and provide the DIP?

15 A      Yes, of course.  I caused delivery of both the debt and

16 equity commitment letters to counsel for the debtors and to

17 David Mack demonstrating my ability to consummate the

18 alternative restructuring proposal, that those papers remain

19 in full force and effect and have not been terminated or

20 withdrawal in any way.

21 Q      So it's right that you had both debt and equity

22 commitment letters?

23 A      Yes, that is correct.

24 Q      And can you tell me about the debt commitment that you

25 have?

1   A      Yes, I'm happy to.  The debt commitment was for $55

2   million in new mortgage loan financing from a nationally

3   recognized lender, a third party lender.  It included a four-

4   year term with a one-year extension option, so a total of

5   five years, and the interest rate at six and a half percent.

6   There's the one percent up-front fee payable at closing and

7   no exit fee.

8   Q    And how about the equity commitment, describe that,

9   please.

10  A    By the way, I'd like to mention that the one percent

11  up-front fee is for the $55 million, not for the DIP loan.  I

12  think I heard previous testimony suggest that somehow I was

13  charging a one percent fee for the DIP loan, I believe I

14  heard that correctly, but that's not correct.

15  Q    Thank you for clarifying that.  Now, how about this

16  equity commitment that you received, can you describe that,

17  please?

18  A      I can.  The equity commitment letter that I provided

19  provided equity financing -- it provided the equity financing

20  necessary to consummate the alternative restructuring

21  proposal that I've made.  That commitment letter evidenced

22  liquid capital in an amount approximately double what was

23  necessary to consummate the alternative restructuring

24  proposal.

25  Q    Now, with the term sheet, what were you trying to do?

1 Were you trying to reinvent the wheel or were you trying to

2 get close to what Juniper was doing?

3 A      No, I mean, I was not trying to reinvent anything.  In

4 fact, I was -- I intentionally kept the proposal as simple as

5 possible given the time pressures of the prepackaged plan.  I

6 felt that I could step into the Juniper deal to lower the

7 execution costs and to avoid negotiation.  The debtors had

8 already negotiated acceptable documentation.  Juniper was

9 prepared to step in with those documents.  That's why I

10 offered both the DIP facility and an exit plan.  If I only

11 had offered a DIP, I feared somebody would cry foul by saying

12 that there's no exit commitment.  I simply -- it simply

13 looked better, you know, from my perspective, that the

14 current loan and plan remained the same as that that was

15 integrated under the RSA.

16      So it was just a simple -- the same documentation, just

17 better terms, as simple as it gets.

18 Q      And what are the more favorable terms that you're

19 offering?

20 A      I was offering the same amount of DIP loan financing

21 with zero percent interest compared to the existing DIP loan

22 that the debtors are looking favorably upon, which is at six

23 percent.  So it saved six percent in interest on the DIP

24 loan.  The Juniper proposal has a ten percent exit fee; my

25 proposal had no exit fee.  The savings over the term of the

1  DIP loan would run into the hundreds of thousands of dollars,

2  which, given a project that's losing money, you know,

3  operational losses, you know, it's significant.  In addition,

4  we're far leaner and believe there our legal costs would be a

5  fraction of those that will be incurred under the Juniper

6  proposal.

7       My proposal includes a debt commitment for four years

8  with a one-year extension, as we mentioned before.  That

9  eliminates substantial risk that exists in the Juniper

10  proposal given the uncertainty of a refinancing.  The project

11  is not completed, there's substantial construction that

12  remains, and its cost overruns and operating losses and the

13  fact that it's missed the season, it's going into the winter

14  and the winter season is very -- you know, very challenging

15  in Santa Fe, people don't visit during that time of the year.

16  So those losses are expected to accelerate and I was bringing

17  sufficient capital to the table to weather that storm, and

18  that's the kind of storm that lenders tend to avoid.  So I

19  thought that that -- you know, just that item was pretty

20  compelling.

21       Juniper's mortgage loan rate is approximately 11 and a

22  half percent, my proposal is for six and a half percent, that

23  saves four million -- you know, four and a quarter million

24  dollars a year just by itself.  Juniper's stated equity

25  return in their proposal before the Court is 30 percent; my

1  proposal is 27 and a half percent.  That creates a

2  substantially better prospect of return for the equity.  My

3  lender is willing to lend additional funds for the completion

4  of Phase II, which is casitas that can be sold or put into

5  the hotel pool.  That equity is non-dilutive to the current

6  equity holders and stands to unlock 25 to $30 million in

7  additional proceeds that clearly is to the benefit of the

8  equity holders; Juniper has no such commitment.

9        That's basically -- you know, I think I've covered

10  most, if not all, of the advantages.  I hope I answered your

11  question.

12  Q    You did.  And, given all these more favorable terms,

13  did the debtors ask you any questions about the term sheet?

14  A    No, no.  They have not -- they've not asked any

15  questions.  Their lawyer asked for some documentation, but

16  there were no substantial questions asked.

17  Q    And did your counsel provide that documentation to the

18  debtors?

19  A    Yes, yes, he did.

20  Q    And did you prepare loan documents and get this all

21  papered in anticipation of the proposal being accepted?

22  A    No, we didn't prepare loan documents because we -- you

23  know, obviously, the debtors haven't engaged, but the loan

24  documentation is virtually the same documents that exist.  So

25  the preparation -- the only preparation that's necessary,

1  basically, is changing the financial terms that we -- you

2  know, we've put forth.  So we've already agreed in our

3  proposal to accept the existing loan documentation.

4  Q     Do you have any idea, have you speculated why the

5  debtors haven't engaged with you about this proposal?

6  A     I have no idea.  I mean, it's incomprehensible, it's

7  inexplicable.  I just -- I'm blown away by the fact that

8  they've refused to engage.

9  Q     Well, if they were to take it, who would be better off

10 under your deal than under the Juniper deal, how is it better

11 -- or whose pot does it make better?

12 A     Well, it pays the debtors off in full.  So, I mean,

13 they came initially to lend money to the project and so

14 getting paid off in full, I would think, was a benefit to the

15 debtors -- I mean to the lenders.  The debtors are better off

16 to the tune of $25 million at the end of three years, which

17 is the time at which Juniper has indicated directly to me and

18 I believe to the debtors that they would be looking to sell

19 the project.  That number continues to grow roughly $12

20 million a year after that and there's the 25 to $30 million

21 in incremental revenue that I just mentioned about the casita

22 construction in Phase II, for which there's really no funding

23 provided for by the current lenders, and it may not even be

24 constructed or value generated for the equity holders under

25 that plan where it is under mine.

1    I also believe that the property will sell for a heck

2  of a lot more money in five or ten years than it will in

3  three years where three years, the property is just getting

4  to the point of stabilization, it's not -- it's not in the

5  debtors' interest.  And the debtors have acknowledged in

6  previous conversations that it is not in the debtors'

7  interest that whoever acquires this property sells it too

8  quickly.  They get buried under that scenario.  So the fact

9  that I'm a long-term holder and Juniper is not clearly

10  accrues to the debtors' benefit.

11    And the debtor -- at least in one instance, the debtor

12  is a fund.  Michael Norvet indicated that, I think, in his

13  testimony.  And those investors, which are mom-and-pop, small

14  investors, clearly benefit from our proposal, there's far

15  more money available for them than under the Juniper plan

16  that's before the Court.

17    And then, finally --

18           MR. WRIGHT:  Judge, I'm going to object again.

19  The Juniper plan is not before the Court, it's before the

20  Court on October 7th, and this testimony is all going to a

21  discussion about different plans, not different DIP financing

22  proposals.

23           THE COURT:  I understand.  You can argue that, but

24  I'll again give them some leeway.

25           THE WITNESS:  And then, finally, our proposal has

1   a (indiscernible) call feature that ensures that the debtors

2   and their beneficiaries, including those mom-and-pop

3   investors, have the right to put their interests to me at a

4   time -- at fair market value at a time of their choosing that

5   would allow them to feel comfortable that they're exiting the

6   project at a time where they're maximizing their returns, as

7   opposed to the Juniper scenario where Juniper decides when

8   the exit occurs, and debtors have no say in that aspect of

9   that deal.  That's a pretty big --I thought a pretty big

10  advantage to the debtors.

11  BY MR. HORAN:

12  Q    Did the debtors try to negotiate better terms of the

13  DIP than those presented in the term sheet, and just for the

14  DIP?

15  A    I'm sorry, ask the question again?

16  Q    As to the DIP --

17  A    Yes.

18  Q    -- that you've proposed in your term sheet --

19  A    Yes.

20  Q    -- did the debtors try to negotiate better terms with

21  the DIP?

22  A    No, they did not.

23  Q    If they'd asked for better terms, would you have been

24  open to a discussion about that negotiation?

25  A    Yeah, absolutely.

1  Q     And are you still open to negotiating?

2  A     Of course.

3  Q     If the debtors asked you to do a zero interest stand-

4  alone DIP, would you have done that?

5  A     Well, I would certainly have been interested in the

6  discussion, yes.

7           MR. HORAN:  Just one second, please.

8        (Pause)

9           MR. HORAN:  Those are all the questions I have.

10           THE COURT:  Thank you.

11           Any cross?

12           MR. WRIGHT:  Yes, Judge.

13                        CROSS-EXAMINATION

14  BY MR. WRIGHT:

15  Q     Mr. Blank, the proposal that you did make that's in

16  your term sheet, that is not a stand-alone DIP, is it?

17  A     It contains DIP financing.

18  Q     Right, it includes DIP financing, but it also includes

19  plan provisions as well, right?

20  A     Yeah, yeah.  It (indiscernible) --

21  Q     Because, I mean, what you're talking about here --

22  A     -- (indiscernible) --

23  Q     -- before your loan --

24           THE COURT:  Please, let him finish his answer.

25           MR. WRIGHT:  Okay.

1              THE WITNESS:  It is a comprehensive proposal,

2   including the DIP feature, yes.

3   BY MR. WRIGHT:

4   Q     Right.  And the four-year loan that you referenced,

5   that would be a loan under the proposed plan terms that you

6   would make, right?

7   A     It's the -- it's an -- it's a loan that your clients

8   have been aware of for months.  This is not a new issue; this

9   is an issue that's been on the table.  The only change in the

10  loan has been an improvement in the interest rate and other

11  features; it increased from 53 million to $55 million, the

12  interest rate decreased, so on and so forth, but it's the

13  same loan that has been -- that was brought to your attention

14  long before the proposal that went to the Court.

15  Q     My question, though, is -- really is what we call exit

16  financing.  It's the loan that you would be putting in place

17  when the company exited bankruptcy, right?

18  A     I'm not a bankruptcy attorney, I -- well, that's a

19  little more technical than I'm capable of answering right

20  now.

21  Q     Well, let me ask you this way.  That loan would be

22  intended to take out the existing creditors, is that right?

23  A     It would.

24  Q     And the six and a half percent interest rate that you

25  mentioned, that would be an interest rate that would be

1  charged in connection with that facility, not in connection

2  with the DIP facility?

3  A    It is a -- it is a -- yeah, it is a loan, yeah.  I

4  mean, they're both loans.

5  Q    All right.  And then the -- under your DIP financing

6  proposal, there would be a requirement for a lien on the real

7  estate, is that correct?

8  A    Ask the question again.  I'm sorry.

9  Q    Okay.  Under your proposal, as I read it, it requires

10  that the loan be secured, the DIP financing loan be secured

11  by a lien on the real estate, is that correct?

12  A    I don't recall the specific provision.

13  Q    Well, if it's in the term sheet, you would stand by

14  that?

15  A    Yes.

16  Q    And you understand that Juniper does not have a lien on

17  the real estate, so effectively that would put a lien of

18  that.  Do you understand?

19  A    I'm not arguing the point with you; I don't know the

20  answer, but I'm not arguing the point.

21  Q    Now, you do admit that prior to the bankruptcy filing

22  you had planned to purchase the property at a UCC sale, is

23  that correct?

24  A    At four of them.

25  Q    Okay.  And in purchasing the property at the UCC sale,

1  was it going to be your intention to buy it for the debt?

2  A    That's impossible to say.  I don't know how to answer

3  that question.  Depending on the nature of the bidding, it

4  could have been more than the debt.

5  Q    If you were not outbid, you would have planned to pay

6  off the Juniper debt, is that right?

7  A    Well, I wouldn't -- it was not the plan to bid more

8  than what was necessary to prevail at the auction, if that's

9  -- is that your question?

10  Q    Yes.

11  A    Okay.

12  Q    Now, you've referenced to mom-and-pop investors, are

13  you talking about mom-and-pop investors at --

14  A    May I correct that?

15  Q    Yes.

16  A    My recollection of the rules of the auction were that

17  you had to bid in increments of $250,000.  So, assuming that

18  the lenders bid their loan amount, then my bid would have had

19  to have been $250,000 more than that in order to prevail.  So

20  the answer is I would have bid more, but I think in any event

21  then the debt -- maybe much more, but at least that much

22  more.

23  Q    At least $250,000 more --

24  A    Yes.

25  Q    -- is that what you're saying?  Okay.

1    A      Yeah.

2    Q      Mr. Blank, currently, are you an investor in BL Santa

3    Fe Holding?

4    A      Yes -- oh, I'm sorry, no.  The various BL Santa Fe --

5    you know, I mean, the names are so similar, but no.

6    Q      And you're not holding yourself out as an interest

7    holder in either of the debtors, are you?

8    A      No.

9    Q      Do you have a creditor claim against either of the

10   debtors?

11   A      I believe I do, yes.

12   Q      How much?

13   A      I don't know the number off the top of my head, north

14   of -- certainly north of a million dollars.

15   Q      What's it for?

16   A      The costs -- the deal costs that I'm entitled to under

17   an agreement with the managing member.

18   Q      Is that an agreement that was signed by Mr. Holland?

19   A      It was signed by Mr. Holland, correct.

20   Q      Do you have any prior hotel experience?

21   A      Well, I -- how do you define hotel experience?

22   Q      Well, let me ask you this --

23   A      That has a lot to do with how I would answer that --

24   Q      All right.

25   A      -- but, yes, I know a great deal about hotels and hotel

1  operations because I have -- I've never owned a hotel, but I

2  am not -- I don't lack knowledge in terms of hotel

3  operations.

4  Q    Okay, back on my question on -- you were referencing to

5  mom-and-pop investors.  Are you referring to investors in

6  Holding?

7  A    In Titan Securities.

8  Q    Okay.  And so you're talking about with respect to the

9  investment of Evolution that it has in Holding, is that

10 right?

11 A    That is correct.

12 Q    And you've already heard the spokesman for Evolution,

13 Mr. Norvet, tell the Court that Evolution is in favor of the

14 DIP financing that's (indiscernible) correct?

15 A    I did hear that, yeah -- shockingly, but yes.  I --

16 Q    Well, and you don't have any official position

17 representing the investors in the Evolution Fund, do you?

18 A    I'm sorry?

19 Q    You don't have any stake in the Evolution Fund; you're

20 not an investor, are you?

21 A    No, I am not investor.  No, I am not.

22         MR. WRIGHT:  I'll pass the witness.

23         THE COURT:  Any redirect, Mr. Horan?

24                   REDIRECT EXAMINATION

25 BY MR. HORAN:

1  Q     Mr. Blank, the DIP loan you're offering is secured,

2  right?

3  A     I'm sorry?

4  Q     The DIP loan that you're offering would be a secured

5  DIP facility, is that right?

6  A     Yes, yeah.

7  Q     But you're also committed to pay off Juniper, right?

8  A     Correct, as well as (indiscernible).

9  Q     Is there anything else that you'd like to tell the

10 Court about your DIP proposal that you don't feel that you

11 got a chance to say?

12 A     No, I just felt -- I feel like it's clearly superior,

13 it doesn't require any significant documentation or

14 expenditures or time to make it happen, all of which were

15 things that previous witnesses suggested was the case, none

16 of that is true.

17       The other thing that I recall hearing in today's

18 proceedings was that none of my pre-bankruptcy offers would

19 have led to returns to the debtors and that is just totally

20 inaccurate.  It is, I think, disingenuous and not supported

21 by the facts.  Those proposals did offer significant returns

22 to the debtors.

23            MR. HORAN:  Your Honor, I have nothing else for

24 the witness, but I do have one housekeeping item, Your Honor.

25            THE COURT:  Well, let me see if there's any

1 further recross.

2             MR. WRIGHT:  Nothing else, Judge.

3             THE COURT:  All right.

4             MR. HORAN:  Thank you.  I don't think that I moved

5 Mr. Blank's declaration into evidence and I would just like

6 to make sure that I do that if I failed to.

7             THE COURT:  I think you offered only the term

8 sheet, but --

9             MR. HORAN:  Okay.

10             THE COURT:  -- any objection to --

11             MR. WRIGHT:  I don't have an objection to the

12 declaration.

13             THE COURT:  All right, then the declaration with

14 the attached term sheet is admitted into the record.

15       (Blank declaration received in evidence)

16             THE COURT:  And thank you, Mr. Blank, you may be

17 excused.

18             THE WITNESS:  Thank you.

19       (Witness excused)

20             THE COURT:  All right.  I'll hear argument then.

21             I think I heard from the debtor.  Mr. Horan, do

22 you want to?

23             MR. HORAN:  Yeah, I have a few comments, Your

24 Honor.

25             You know, what the evidence showed today is a

1  failure of the debtors both pre and post-petition to shop for

2  the best deal for all the stakeholders, including the equity,

3  and it also shows that there's a better deal on the table,

4  but they refuse to take it.

5          And the thing that struck me the most about the

6  testimony today was that of Mr. Norvet when I asked him about

7  whether the debtors would exercise their fiduciary out and

8  his answer was no.  I'm astounded by that.  I mean, it's an

9  admission that the process that they're proposing is the

10 process no matter what, no matter if better terms come along,

11 no matter if Mr. Blank has offered a better deal, they're not

12 going to exercise their fiduciary out, and I think that that

13 just shows Your Honor that this was a process that wasn't

14 tailored for anything other than this DIP and the plan we're

15 going to talk about in a couple of weeks.  They've locked

16 themselves into it; they're not looking for any way out of

17 it.  It all begs the question of why they're so intent on

18 this deal with Juniper and have been all along, and so much

19 so that they wouldn't even shop around before locking in with

20 Juniper and they're not going to exercise their fiduciary

21 out.

22          They readily admit that prepetition they only

23 talked to Juniper.  They knew Mr. Blank was out there, they

24 knew he was interested in the business, but they didn't ask

25 him for a proposal.  And even if the purpose of that would be

1  to get Juniper to offer better terms and using it as a

2  stalking horse, shop it against Juniper, they didn't do that.

3  And the evidence shows that prior to the filing of the case

4  that Mr. Blank was prepared to bid at auction.

5          So, despite this interest and they knew about it,

6  they never asked him about his interest in offering a

7  competing transaction.  And since the case filed he's offered

8  the term sheet, on superior terms, we submit, but the debtors

9  didn't respond to it other than to summarily dismiss it by

10 email earlier this week.

11          And the debtors contend that they've appropriately

12 exercised their business judgment, but I'd submit, Your

13 Honor, that the shelter of the business judgment rule isn't

14 available where, as the debtors have done, the company has

15 completely shut its ears and its eyes to not only the

16 potential for a higher and better deal for the company, but

17 that there's one on the table and they're going to ignore it.

18 And, again, they've stated, even if one comes along, they're

19 not going to do it.  Even if they think this isn't the deal,

20 if another one comes along, they're not going to do it

21 because they wouldn't exercise their fiduciary out.

22          I think if the debtors sincerely wanted to engage

23 about DIP, they could have gone to Mr. Blank and see if he's

24 interested.  And that's after the case is filed and they

25 received the offer from Mr. Blank, they could have said to

1 | him, okay, we see your term sheet, but here are the deal
2 | documents with Juniper, you've got 24 hours, 48 hours, mark
3 | them up, get it back to us and we can compare them.  They
4 | didn't ask for that.  They just sat on the offer and then
5 | rejected it without telling Mr. Blank why his offer wasn't of
6 | interest or why it was unacceptable.

7 | So we request that Your Honor deny the motion
8 | because, first, it doesn't represent the best deal available,
9 | not by a long shot, and that's ultimately to the detriment of
10 | equity here, and the Blank proposal is in every respect more
11 | favorable.  He's demonstrated his ability to close, he's got
12 | the backup.  And, second, I just emphasize this again:  the
13 | process is fatally flawed that got you this DIP.

14 | The bankruptcy requires a debtor to be a good
15 | steward of estate assets, the process is important and, on
16 | the evidence before the Court today, it shows that the
17 | debtors have been willfully blind to the possibility that
18 | there could be any other transaction than the Juniper one.
19 | And, for that reason, this DIP doesn't pass muster and it
20 | should be -- the motion should be denied.

21 | THE COURT:  Thank you.

22 | Does the debtor wish to respond?

23 | MR. WRIGHT:  Yes, Judge.  And I'll try not too
24 | much to repeat myself from the opening.

25 | The argument is that the debtor has failed to shop

1   for the best deal, but the testimony is different.  The

2   testimony is that the debtor had existing lenders that it was

3   working with, that those lenders were making sure that the

4   project got completed; they were continuing to advance, make

5   protective advances, even beyond their debt limits, in order

6   to get this property completed.  And that because of the

7   state of construction that the property was in and because of

8   the concern that other lenders are going to want priming

9   liens, which is true of the Blank proposal, it wants a

10  priming lien.  That the debtors made the decision to take the

11  DIP financing that was being offered by the two existing

12  lenders as opposed to looking to other lenders who loaning

13  into a construction site would want to prime the existing

14  debt, the debtors wanted to avoid that fight and they wanted

15  to stay with the -- you know, stay with the one who brung

16  you, is often said, because of the relationship and the trust

17  factor that exists in that these lenders have done what they

18  have said that they will do.

19          They did talk to Mr. Blank and that was the

20  testimony today, that those conversations started back in

21  January of 2021 and that Mr. Blank made repeated attempts to

22  try to buy the property, especially through his ESET, four

23  times at UCC sale, which, as we all know, would have

24  eliminated most likely any return for the equity.

25          Mr. Blank is effectively a bottom feeder; he is

1  trying to buy the property as cheaply as he can get it.  But
2  whether or not his plan stands muster here is something to be
3  decided on October 7th.  This DIP financing that the Court is
4  being asked to approve does not foreclose the ability of the
5  debtors to accept a different plan if they choose not to go
6  forward with the one they have set for hearing on October 7th
7  and it doesn't foreclose the ability of Mr. Blank through Mr.
8  Holland to raise an issue -- or an objection with respect to
9  the plan.

10        But you have to stand back and also think about,
11  you know, we have a Mr. Blank who has no direct connection to
12  this case other than he asserts that he has some claim for a
13  million dollars because he's run up costs in connection with
14  a bid, and then we have two lenders who are owed over $70
15  million who have signed an RSA and are supportive of the plan
16  that is before the Court on October 7th, and we have over 90
17  percent of the equity investors in Holding, the only equity
18  group that we have in this case, and they're all in favor
19  both of this DIP financing.

20        And Mr. Norvet's testimony wasn't that -- I don't
21  think he understood the word "fiduciary out," I don't think
22  he understood the term.  When he was asked other questions
23  with respect to can the debtor still consider other plans, he
24  said yes.  And so I don't think he understood what was being
25  asked when he answered that specification question.  The

1    reality is, whether he understood or didn't understand it, is

2    the debtors still have the ability, they're not foreclosed by

3    accepting a DIP financing from changing horses and going with

4    a different plan; they would be, though, if we approved the

5    term sheet that was presented by Mr. Blank.  That one is

6    specifically tied to his plan and there is no other option,

7    it wasn't presented as a stand-alone DIP facility before the

8    Court.

9           Yes, there is a lower interest rate being offered

10   by him of zero percent interest and that would be very

11   attractive if this was a six-month or a twelve-month case,

12   but it's not.  And as Mr. Norvet testify, when he evaluated

13   with the board and with the independent director the cost of

14   switching, the cost of documentation, which Mr. Blank

15   admitted he has not prepared loan documents with respect to

16   his proposal, the delay involved, the possibility of losing

17   the benefits of the plan that's already on file, and losing

18   the relationship that has been built up with Juniper and DB

19   Bishops, it was his evaluation that staying with the DIP

20   facility and asking the Court to approve this financing makes

21   the most sense for the estates.

22          So we would ask the Court to approve this on a

23   final basis, and if they have additional issues they want to

24   raise at confirmation, I think most of what they raised today

25   can be raised at that time.

1    Thank you.

2    THE COURT:  Any response, Mr. Horan?

3    MR. HORAN:  Your Honor, in that statement Mr.

4  Wright attempted to rewrite the restatements in Norvet's

5  testimony.  Mr. Norvet's testimony is what it was, not what

6  Mr. Wright wishes, and when you're listening to or

7  considering this, I think you should listen closely to what

8  Mr. Norvet said and not what Mr. Wright wants to tell you

9  that he thinks he should have said.

10    And that's all I have, Your Honor.

11    THE COURT:  Well, I agree with Mr. Horan that the

12  testimony has raised some serious issues in my mind about the

13  debtors' ability or intent to fulfill its fiduciary duty to

14  consider other options.  I'm also concerned that approving

15  the DIP on a final basis will tie the debtors' hands to a

16  timetable and a process that may not allow the debtor, even

17  if it wanted to fulfill its fiduciary duty, the process might

18  preclude it from considering on a level playing field

19  alternative proposals.

20    But I appreciate that Mr. Blank feels that he has

21  made the DIP proposal in order to allow the debtor to

22  consider it, but the fact that the alternative DIP is tied to

23  the debtor agreeing to his proposal makes it just as

24  problematic as the debtors'.

25    And while the Court in considering a DIP should

1  consider and gives the debtor considerable deference in

2  exercising its business judgment, I think that bankruptcy

3  requires the Court to also consider whether the debtor is

4  prepared to fulfill its fiduciary duty.  It's not just a

5  reasonable business person once we're in bankruptcy.

6         I'm sorry, I don't have pulled up the terms of the

7  DIP, is there a deadline by which I have to approve a final

8  DIP, Mr. Wright?

9         MR. WRIGHT:  I'd need to look at the interim order

10 to see if we have an expiration date built into it --

11        THE COURT:  Yes.

12        MR. WRIGHT:  -- into the milestones as well, and

13 if anyone else knows that milestone date, that would be

14 helpful.

15        THE COURT:  I just typed in the confirmation and

16 the effective date milestones I did not --

17        MR. BAYLEY:  Your Honor, if I may?

18        THE COURT:  Yes.

19        MR. BAYLEY:  This is Christopher Bayley, law firm

20 of Snell & Wilmer, on behalf of the Juniper parties.  The

21 milestone that's attached to the interim DIP says that the

22 debtors "to obtain the entry by the bankruptcy court of the

23 final DIP financing order in form and substance acceptable to

24 the non-debtor parties in their sole discretion on or before

25 25 calendar days following the petition date."

1       My recollection, Your Honor, and what shall be

2   correct as the petition date was August 30th.  So the time is

3   nigh, Your Honor.

4       THE COURT:  Well, I'm going to suggest that we

5   take a break and the parties talk because, given my grave

6   concerns about this, I'm not certain I'm prepared to approve

7   it today.  I'd like the parties to talk about my concerns and

8   how they can be alleviated on both sides.  I'll present this

9   to both counsel for the debtor and counsel for Mr. Blank or

10  Mr. Holland, how can you solve my problems with each of your

11  alternative DIP proposals.

12       How long do the parties think they might want to

13  talk?  I know you probably have a number of client parties to

14  talk to.  Do we want to come back at the end of today or do

15  you want to try for tomorrow morning?  I have all of tomorrow

16  open.

17       MR. WRIGHT:  I think the end of today, if we could

18  come back, let's -- like at 5 o'clock Eastern?

19       THE COURT:  That might make it.

20       MR. WRIGHT:  It might, it might.

21       THE COURT:  All right.  Any objection, Mr. Horan,

22  5 o'clock?

23       MR. HORAN:  Five o'clock is good.

24       THE COURT:  All right.  Then let's recess until 5

25  o'clock and see where we can go at that time.  Thank you.

1          (Recess taken at 3:33 p.m.)

2          (Proceedings resumed at 5:00 p.m.)

3          THE COURT:  Good afternoon.  This is Judge Walrath

4  and we're back on the record in the BL Santa Fe case.

5          I'll turn it over to counsel for the debtor and

6  see where we are.

7          MR. LUNN:  Thank you, Your Honor.  It's Matthew

8  Lunn from Young Conaway on behalf of the debtors.

9          I appreciate the time, we have -- I think we've

10  used it productively, at least from the debtors' side.  We

11  obviously engaged in conversations with our lenders.  We

12  reached out to counsel for Mr. Holland to see if we can come

13  and reach some sort of agreement with respect to addressing

14  Your Honor's concerns right now.  And I think where the

15  debtors have been able to drive the process -- and, again,

16  the debtors were focused on -- I think this came across --

17  the debtors were focused on the DIP and not the overall plan

18  restructuring proposal was there.  And I think Your Honor

19  also heard that we do have an independent director that's

20  been appointed, there's been a special committee.

21          So a lot of this is going into where I would

22  propose -- or what the proposal would be with respect to the

23  final DIP, which is the debtors have secured an agreement

24  from its lenders to adjourn or extend the final DIP milestone

25  by two weeks to the confirmation hearing date of October the

1   7th.

2          Interestingly, about 35 minutes ago, we received a

3   stand-alone DIP proposal from Mr. Blank; obviously, we

4   haven't had a chance to evaluate it, but this goes part and

5   parcel with what the other condition would be.  The debtors

6   are committing and, in particular, the independent director

7   is going to commit to continue to evaluate proposals that

8   come across from Mr. Blank, and any other third party that

9   comes across he will evaluate, as he has, the plan proposal,

10  he's going to evaluate this stand-alone DIP proposal in

11  connection with the duties that Your Honor has outlined with

12  respect to a debtor-in-possession.  Again, we would make that

13  commitment.

14         There would be a -- sort of to document this, we

15  would need a further interim hearing, because I think some of

16  the borrowings may need to adjust a little bit and we're

17  still looking at that in terms of budgeting and the like, but

18  we would propose that it just be a simple further or second

19  interim order to move out the milestone and any other

20  borrowings that we would need to do under -- to move the

21  process by two weeks, basically, Your Honor.

22         So that would be the debtors' proposal to address

23  Your Honor's concerns with respect to final approval of the

24  DIP.

25         THE COURT:  All right.  So you're looking to

1 | continue this until October 7th and you'll submit a form of
2 | order that would change the DIP final hearing, final order
3 | milestone, as well as the bar date.
4 |    Mr. Horan, do you have any comments on that
5 | proposal?
6 |    MR. HORAN:  Yeah.  And can you hear me, Your
7 | Honor?  I'm having a little trouble with the audio.
8 |    THE COURT:  I can.
9 |    MR. HORAN:  Oh, thank you so much.
10 |    First, I want to give you a brief overview of
11 | what's proposed because it's a total game changer.
12 |    MR. LUNN:  Your Honor, I don't think it's --
13 |    THE COURT:  Well, Mr. Horan, I don't want to get
14 | into the terms of your proposal --
15 |    MR. HORAN:  Okay, Your Honor.
16 |    THE COURT:  -- if in fact the debtor is committed
17 | to considering that, obviously, before the October 7th
18 | hearing.
19 |    MR. LUNN:  And just to make clear, Your Honor --
20 | it's Matthew Lunn -- we are committing to do that.  I just
21 | want -- so the record is completely clear, we are committing
22 | to evaluating that proposal that comes in -- that just came
23 | in.
24 |    THE COURT:  Okay.  All right.  And are you okay
25 | with this two-week extension, if you will, Mr. Horan?

1    MR. HORAN:  The concern I have with that, Your

2  Honor, is that, you know, really, again, it goes back to the

3  fact that the DIP and the RSA are so intertwined and we're

4  driving this right towards the plan confirmation date.  And,

5  you know, I understand and don't doubt for a second Mr.

6  Lunn's representations, but I do have that concern.

7    MR. LUNN:  Your Honor, and we understand that, you

8  know, it has the appearance that these things are coupled

9  together, but what I would remind Your Honor of is we have a

10  plan that's on the table that proposes to pay general

11  unsecured creditors in full.

12    THE COURT:  Well, I don't need to get into the

13  details --

14    MR. LUNN:  No, I --

15    THE COURT:  -- of plan confirmation either.

16    MR. LUNN:  No, all I'm saying -- I say that with

17  the following -- sort of the reason, Your Honor, is the

18  debtors are trying to preserve that to get to that end

19  result, which is clearly an outstanding result where

20  unsecured creditors are being paid in full, and we're trying

21  to hold that together and get to a confirmation that gets

22  that goal.  If there's a better deal to be proposed, there's

23  a better deal to be proposed, and we're committing to

24  evaluating that proposal.

25    THE COURT:  Well, I just -- for the record, I will

1  agree to any order extending the interim DIP, subject to your

2  submitting a revised bar date and subject to the debtors'

3  commitment that it will consider all proposals for

4  alternative DIPs and for alternative plans during that

5  interim.

6         MR. LUNN:  Thank you, Your Honor.  We'll prepare a

7  form of order and submit it under certification of counsel

8  for your consideration.

9         THE COURT:  All right, and thank you.  It sounds

10 like both parties have taken my comments to heart and I hope

11 you can make some progress.

12        All right, we'll stand adjourned then.

13        MR. LUNN:  Thank you, Your Honor.

14        THE COURT:  Thank you.

15        MR. HORAN:  Thank you, Your Honor.

16     (Proceedings concluded at 5:06 p.m.)

17                        CERTIFICATE

18

19    We certify that the foregoing is a correct transcript

20 from the electronic sound recording of the proceedings in the

21 above-entitled matter.

22
   /s/Mary Zajaczkowski              September 24, 2021
23 Mary Zajaczkowski, CET**D-531

24
   /s/ Tracey J. Williams            September 24, 2021
25 Tracey J. Williams, CET-914