**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| BL SANTA FE, LLC, et al., | ) | Case No. 21-11190 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Rel Docs: 244, 285, 289, |
| | ) | 309, 310 |

**OPINION[1]**

Before the Court is the Objection of the Reorganized Debtor BL Santa Fe, LLC (the "Reorganized Debtor") to the two proofs of claim filed by Realty Financial Resources, Inc. ("RFR").  For the reasons set forth below, the Court will overrule the objection and allow RFR's claims.

I.   PROCEDURAL BACKGROUND

This case was commenced by the filing of petitions under chapter 11 of the Bankruptcy Code by BL Santa Fe, LLC ("BLSF Senior Borrower") and (2) BL Santa Fe (Mezz), LLC ("BLSF Mezzanine Borrower") (collectively, the "Debtors") on August 30, 2021 (the "Petition Date").  BLSF Senior Borrower owned Bishop's Lodge, a luxury resort located in Santa Fe, New Mexico, which it had acquired in 2014.[2]

---

[1]   This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.

[2]   See D.I. 14 at ¶ 6.  References to the docket in this case are to "D.I. #."  The exhibits admitted into evidence in this contested matter are identified as "D-#" for the Reorganized

The bankruptcy filing was caused by financial difficulties, delays, and cost overruns affecting the renovation of Bishop's Lodge.  As of the Petition Date, the senior lender, Fortress,[3] was owed $40,979,543.53 million and the Mezzanine Loan lender, Juniper Bishops, LLC ("Juniper"), was owed $33,594,752.40.[4]  On the Petition Date, the Debtors filed a pre-packaged Plan of Reorganization that had been accepted by Fortress and Juniper providing for the amendment of Fortress' debt and the conversion of Juniper's debt to 100% of the equity in BLSF Senior Borrower.[5] On October 21, 2021, the Court confirmed the Plan, as revised, which went effective immediately.[6]

RFR filed two proofs of claim in the case: Claim No. 12, which asserts a claim of $175,000 for unpaid fees for its work relating to the financing of Bishop's Lodge by Fortress and Juniper in 2019,[7] and Claim No. 20, which asserts a claim of $745,742.96 for fees related to the refinancing of the Juniper

---

Debtor's exhibits and "R-#" for RFR's exhibits.

[3]     The Senior Lender is DB Bishops Lodge, LLC, an affiliate of Fortress Credit Co., LLC (referred to herein as "Fortress").

[4]     Ex. D-9 at Art. III.B.a.ii & Art. III.B.f.ii.

[5]     Id.  See also Ex. R-63 at 2-9, 15-27.  The Plan was revised on October 14, 2021, without changing the treatment of Fortress or Juniper.  Ex. R-47.

[6]     Exs. D-10 & D-11; D.I. 171.

[7]     Ex. R-53.

and Fortress secured debt in the confirmed Plan.[8]  On January 30,

2023, the Reorganized Debtor filed an Objection to Claim Nos. 12

and 20.[9]  On June 16, 2023, RFR filed a response.[10]  On June 30,

2023, the Reorganized Debtor filed its reply.[11]

On December 12 and 13, 2023, the Court conducted an

evidentiary hearing on the Objection to the Claims.[12]  Following

the trial, RFR and the Reorganized Debtor filed Post-Trial

Closing Briefs on January 10, 2024.[13]  The matter is ripe for

decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this matter.[14]  The

resolution of claim objections is a core proceeding over which

the Court has Constitutional authority to enter a final order.[15]

---

[8]     Ex. R-55.

[9]     D.I. 244.

[10]    D.I. 285.

[11]    D.I. 289.

[12]    D.I. 307 & 308.

[13]    D.I. 309 & 310.

[14]    28 U.S.C. §§ 157(a) & 1334.

[15]    28 U.S.C. § 157(b)(2)(B).  By filing its proofs of claim,
RFR has consented to the jurisdiction of the Court to decide its
claims.   See <u>Waldman v. Stone</u>, 698 F.3d 910, (6th Cir. 2012)
(concluding that even under <u>Stern v. Marshall</u>, a bankruptcy court
has authority to enter final judgment on an objection to a proof
of claim which only seeks disallowance of the claim and no
affirmative relief) (citing <u>Stern v. Marshall</u>, 564 U.S. 462

III. <u>DISCUSSION</u>

    A.   <u>Burden of Proof</u>

A proof of claim that is properly executed and filed by a claimant "shall constitute prima facie evidence of the validity and amount of the claim."[16]  Pursuant to section 502(a) of the Bankruptcy Code, a filed proof of claim "is deemed allowed, unless a party in interest . . . objects."[17]  The party disputing the validity of a properly filed claim must "produce evidence sufficient to negate the prima facie validity of the filed claim."[18]  If the objector fails to meet this burden, the claim objection must be overruled.[19]  However, if the objector produces evidence negating the prima facie validity of the claim, the burden shifts back "to the claimant to prove the validity of the

_____

(2011).  <u>See also</u> <u>Langenkamp v. Culp,</u> 498 U.S. 42, 44 (1990) (holding that filing a proof of claim "trigger[ed] the process of 'allowance and disallowance of claims,' thereby subjecting [creditor] to the bankruptcy court's equitable power" to adjudicate the claim).
    The Reorganized Debtor has expressly consented to the entry of a final order on its objection to the RFR claims.  D.I. 244 at ¶ 61.  <u>See Wellness Int'l Network, Ltd. v. Sharif</u>, 575 U.S. 665, 683-84 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent).

[16]    Fed. R. Bankr. P. 3001(f); <u>In re Allegheny Int'l, Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1994) ("[A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.").

[17]    11 U.S.C. § 502(a).

[18]    <u>Allegheny Int'l</u>, 954 F.2d at 173.

[19]    <u>In re F-Squared Inv. Mgmt., LLC</u>, 546 B.R. 538, 544 (Bankr. D. Del. 2016).

claim by a preponderance of the evidence."[20]  In a contested claim proceeding, the ultimate "burden of persuasion" rests with the claimant.[21]

B.   Basis of RFR's Claims

RFR's claims[22] are based on agreements between the Debtors and RFR pursuant to which RFR was retained to assist the Debtors with soliciting and negotiating financing for Bishop's Lodge. The Reorganized Debtor does not contest that RFR was retained by the Debtors to obtain financing but disputes that it is entitled to the fees requested.  The Reorganized Debtor alleges that RFR has failed to meet its burden of establishing that those agreements are still valid or, if valid, that RFR is entitled to any remaining compensation under them.

1.   Claim No. 12

Claim No. 12 is based on the retention of RFR by the Debtors, prior to 2019, to obtain capital or financing for the Debtors to acquire and renovate Bishop's Lodge.[23]  Because the Debtors did obtain financing in 2019 from Fortress and Juniper, RFR asserts it earned a fee of $880,000, of which $175,000 remains unpaid as represented by a Note and a modification of the

---

[20]   Allegheny Int'l, 954 F.2d at 174.

[21]   Id.; F-Squared, 546 B.R. at 544.

[22]   Exs. R-53 & R-55.

[23]   See Ex. R-25; D.I. 307 at 19:19-20:8, 22:18-23:9.

Note (the "Note Modification").[24]  Claim No. 12 attached a copy
of the Note Modification.[25]

 The Reorganized Debtor argues that Claim No. 12 must be
disallowed because RFR failed to attach the original Note, the
writing upon which its claim is based.  As a result, the
Reorganized Debtor contends that RFR has not satisfied its burden
of proof under Bankruptcy Rule 3001(c)(1)[26] and section 3-309 of
the Uniform Commercial Code (the "UCC").[27]

  a. <u>Evidence Presented</u>

 At the evidentiary hearing, RFR presented evidence to
support Claim No. 12.  It offered the testimony of Gregory Pitts
of RFR who testified that under its retainer agreement with the
Debtors, RFR's fee for the financing provided by Juniper and
Fortress in 2019 totaled $880,000 and was due at the closing of

---

[24] Exs. R-15, R-18, R-19.

[25] Ex. R-53.

[26] Rule 3001 provides that a creditor whose claim is based on a
writing must attach it to the proof of claim, but if it is lost
or destroyed, a statement of the circumstances surrounding the
loss should be attached to the proof of claim.  Fed. R. Bankr. P.
3001(c)(1).

[27] Section 3-309(a) of the UCC provides a standard for proving
a claim when the negotiable instrument on which it is based is
not available.  The parties cite the Delaware, California, and
New Mexico versions of the UCC.  <u>See</u> N.M. Stat. Ann. § 55-3-309;
Del. Code Ann. tit. 6, § 3-309(a); Cal. Com. Code § 3309(a).
Each state's version of § 3-309 is identical.  Because the issues
discussed herein involve a claim which arose in New Mexico, the
Court will cite herein to the New Mexico statute.

the Loans.[28]  However, Mr. Pitts testified that the Debtors were
unable to pay that fee in full at closing and RFR agreed to, and
was paid, a partial payment of $730,000 at closing, with the
remaining $150,000 to be paid pursuant to a promissory note.[29]

Mr. Pitts also testified that RFR has been unable to locate
the original Note despite his efforts, because it was lost when
his partner, George David, moved his office.[30]  He stated that he
reached out to Richard Holland, the Debtors' manager at the time
of the 2019 financing, to obtain a copy of the Note.[31]  RFR
presented a copy of the signed Note as evidence of the existence
and terms of the Note.[32]  RFR also presented the testimony of Mr.
Holland, who confirmed that Exhibit R-18 was a copy of the Note
and that the signature was his.[33]  Mr. Holland also testified

---

[28]    Pursuant to the retainer agreement, RFR earned a success fee
equal to 1% of the Fortress loan ($43 million) and 3% of the
Juniper loan ($15 million), or a total fee of $880,000.  Ex. R-
15; D.I. 307 at 22:18-23:5.

[29]    D.I. 307 at 23:6-20; D.I. 308 at 83:8-11.  The Reorganized
Debtor's exhibits corroborate this testimony.  See Exs. D-15, D-
17, D-20, D-21.

[30]    D.I. 307 at 13:4-9 ("Q. Okay.  And to be clear, Realty
Financial Resources doesn't have the original of this allegedly
executed promissory note, does it?  A. We have a scanned copy of
the promissory note.  The original has been lost in a move of my
previous partner, George David.").

[31]    See Ex. D-16 (correspondence between Mr. Pitts and Mr.
Holland dated January 30, 2023, seeking assistance in finding a
copy of the original promissory note).

[32]    Ex. R-18.

[33]    See D.I. 308 at 85:9-86:20 ("Q. . . .  Now, Mr. Holland, the
signature block on [Exhibit R-18] is obviously quite illegible,

that the Note represented the $150,000 in fees due to RFR which was not paid at closing of the 2019 financing.[34]  Mr. Holland testified that he executed and hand-delivered the original Note to George David, RFR's President.[35]

Mr. Pitts and Mr. Holland both testified that the Note was modified when the Debtors could not pay the $150,000 due by the Note's maturity date, June 15, 2020.[36]  The Note Modification provides for an extension fee of $25,000 if the Note was not repaid by May 31, 2021.[37]  Both Mr. Pitts and Mr. Holland testified that RFR was not repaid by May 31, 2021, and has still not been paid the balance of the fee earned in 2019.[38]

---

which I assume comes from age or copying or anything like that. But did you sign this document?  A. I did, yes.  Q. And did you sign this document on behalf of BL Santa Fe, LLC?  A. Yes. . . . Q. So, Mr. Holland, just to clarify, you are testifying here today that this is your signature on the signature block of [Exhibit R-18]?  A. Yes.").

[34]    See id. at 83:8-18 ("Q. Do you recall the amount that Realty did receive, if any, as a result of the 2019 loans?  A. They received all but $150,000 of the fee in cash payment at the time of closing.  Q. Okay.  Mr. Holland, was that $150,000 given or was there any concessions given to and by Realty on account of that $150,000?  A. No concessions, no forgiveness.  It was just a deferral.  Q. And how was that 'deferral,' . . . memorialized? A. In the form of a note, a promissory note.").

[35]    See D.I. 308 at 89:4-19.  See also Exs. D-15 & R-62.

[36]    See D.I. 307 at 33:19-37:15; D.I. 308 at 92:10-93:21. See also Ex. R-19.

[37]    Ex. R-19.

[38]    D.I. 307 at 38:24-39:10; D.I. 308 at 94:3-14.

Instead of relying on Mr. Holland's and Mr. Pitt's testimony alone, however, RFR presented corroborating evidence of the existence of the Note and the amount due to RFR.  That evidence included: (1) an invoice dated June 6, 2019, given to the Debtors showing the calculation of RFR's fee of $880,000 and that $730,000 was to be paid at closing and $150,000, secured by a promissory note, was to be paid at a later date,[39] and (2) emails confirming the payment of the $730,000 at closing and the issuance of the Note to pay the balance due to RFR.[40]

In rebuttal, the Reorganized Debtor offered the testimony of Mr. Wolf of Juniper, who stated that neither Juniper nor Fortress were aware of the Note or any agreement by the Debtors to pay RFR anything relating to the 2019 loans other than the amount paid at closing as reflected on the Disbursement Statement.[41]

RFR, however, presented testimony of both Mr. Pitts and Mr. Holland to refute Mr. Wolf's testimony and confirm that Juniper and Fortress were both aware in 2019, before closing, that there

---

[39]   Ex. R-15.  D.I. 307 at 43:11-14 ("[T]he invoice was submitted and included in the closing packet, and our fees were on the closing statement and dispersed through title, which everyone had the chance to see."), 47:4-7 ("I believe that all invoices were included in the closing packet for everyone to review before closing occurred.  And our amounts were on the closing statement as well.").

[40]   Exs. D-15 & D-13.

[41]   D.I. 307 at 70:10-72:24, 77:20-78:20.  See also Ex. D-21.

was a shortfall in funds to pay all the professionals which the Debtors were trying to solve.[42]

        b.   <u>Argument</u>

RFR argues that it has presented sufficient evidence in support of Claim No. 12 to warrant its allowance.  It contends that the testimony of Mr. Holland was credible, and that Exhibits R-18 (the Note) and R-19 (the Note Modification) were sufficient to prove the existence and terms of its claim of $175,000.

Further, RFR asserts that it has presented sufficient evidence to show that the failure to produce the original Note meets the requirements of section 3-309 of the UCC.[43]

---

[42]   D.I. 307 at 44:11-23, 44:24-45-11; D.I. 308 at 100:4-17, 101:2-10.

[43]   Section 3-309(a) of the UCC provides that:
(a) A person not in possession of an instrument is entitled to enforce the instrument if:
    (1) the person seeking to enforce the instrument
        (A) was entitled to enforce the instrument when loss of possession occurred, or
        (B) has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred;
    (2) the loss of possession was not the result of a transfer by the person or a lawful seizure; and
    (3) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process . . . .

Specifically, RFR contends that it has established that RFR did not lose possession of the Note via transfer or lawful seizure and, despite its efforts to locate the original Note, its whereabouts could not be determined.[44]

The Reorganized Debtor argues that RFR has not satisfied the requirements of section 3-309 to prove a claim based on a lost negotiable instrument. The Reorganized Debtor contends that Mr. Holland's testimony is not credible because the document he identified as a true copy of the Note contained an illegible signature, was clearly marked as a "draft," and the email sending it states that the parties were still negotiating its terms.[45]

It further argues that the Note Modification (and the other documents offered by RFR to support its claim) do not evidence the existence of a promissory note because they do not contain all of the terms of the Note. Finally, the Reorganized Debtor contends that the closing Disbursement Statement reflected that RFR was paid its fees for the work it did (in the amount of $730,000) without any indication that additional sums were due.[46]

Thus, the Reorganized Debtor argues that the evidence presented by RFR does not meet its burden of proving the terms of

---

N.M. Stat. Ann. § 55-3-309(a)(1)(A).

[44]   D.I. 307 at 13:4-9; D.I. 308 at 89:11-19. <u>See also</u> Ex. D-16.

[45]   Ex. R-18; D.I. 308 at 95:20-96:6.

[46]   Ex. D-21.

11

the Note and, consequently, asserts that Claim No. 12 must be disallowed.

          c.   <u>Conclusion</u>

The Court rejects the Reorganized Debtor's arguments. First, its assertion that RFR's failure to attach the original Note to Claim No. 12 is fatal to the allowance of its claim as a result of Bankruptcy Rule 3001(c)(1) or section 3-309 of the UCC is misguided.

Rule 3001(c)(1) of the Federal Rules of Bankruptcy Procedure provides that "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim."[47] However, that Rule recognizes that the writing may not always be available and thus provides that "[i]f the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim."[48]  Although RFR did not attach such a statement to Claim No. 12, the Court concludes that RFR did present sufficient evidence at the hearing to explain that the Note was lost and the circumstances surrounding that loss.[49]

In addition, Rule 3001 is procedural and Courts have given great leeway to claimants to prove their claims even if the claim

---

[47]    Fed. R. Bankr. P. 3001(c)(1).

[48]    <u>Id.</u>

[49]    <u>See</u> notes 30-32.

as filed is deficient.[50]  Furthermore, a failure of RFR to attach

the Note simply means that the proof of claim may not be prima

facie valid, but does not preclude the claimant from presenting

evidence in support of its claim.[51]

Similarly, the UCC specifically contemplates that a

negotiable instrument[52] may be lost and, consequently, allows the

claimant to prove its claim by evidence other than the instrument

itself.  Under section 3-309 of the UCC, a party may enforce a

negotiable instrument, even if it is not in possession of the

instrument, if: (1) the person seeking to enforce the instrument

"was entitled to enforce the instrument when loss of possession

occurred;" (2) "the loss of possession was not the result of a

---

[50]   See, e.g., In re Kincaid, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008) ("The law is well settled that failure to attach supporting documentation as required by a rule of procedure is not grounds for disallowance of a claim as § 502(b) supplies the exclusive basis for claim disallowance.  Rather where the proof of claim does not adhere to the requirements of Rule 3001 by providing the facts and documents necessary to support the claim, it is not entitled to the presumption of prima facie validity.  Absent the application of the presumption, the burden of going forward and proving its claim by a preponderance of the evidence remains on the claimant.") (citations omitted).

[51]   Id.  See also In re Umstead, 490 B.R. 186, 197 (Bankr. E.D. Pa. 2013) (concluding that a proof of claim may be prima facie valid despite noncompliance with Rule 3001(c), if the information included in the proof of claim, or other evidence in the bankruptcy case record, provides sufficient indicia of the claim's validity and amount to justify imposing on the objector the burden and expense of responding with contrary evidence).

[52]   See, e.g., 2020 Del. Super. LEXIS 167, at *5 (Del. Super. Ct. Apr. 13, 2020) (a promissory note is a negotiable instrument).

transfer by the person or a lawful seizure;" and (3) the person seeking to enforce the instrument cannot obtain possession of the instrument because, among other things, "its whereabouts cannot be determined."[53]  To enforce a missing negotiable instrument, the person seeking enforcement may prove the terms of the instrument and the person's right to enforce the instrument by extrinsic evidence.[54]

Based on the evidence presented in this case, the Court concludes that RFR has sufficiently proven both its right to enforce the Note and the terms of the Note pursuant to section 3-309.  RFR produced a copy of the signed Note and the credible testimony of Mr. Holland who stated that Exhibit R-18 was a true and correct copy of the original Note he signed.[55]

Further, the Court finds that RFR has met the requirements of section 3-309 by showing that it was entitled to enforce the Note when it was lost, that the loss of possession was not the result of a transfer or lawful seizure, and that RFR was unable to locate the Note.[56]  As a result, the Court concludes that RFR

---

[53]   N.M. Stat. Ann. § 55-3-309(a).

[54]   Section 3-309(b) of the UCC provides in relevant part that:
A person seeking enforcement of an instrument under Subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument. . . .
N.M. Stat. Ann. § 55-3-309(b).

[55]   Ex. R-18; D.I. 308 at 89:6-7, 89:15-19.

[56]   D.I. 307 at 13:4-18, 23:6-24:13, 26:17-27:5; D.I. 308 at 99:2-100:3.

has presented sufficient evidence to explain its failure to produce the original Note to satisfy section 3-309 of the UCC.[57]

In addition to the Note and the above testimony, the Court finds that RFR presented substantial corroborating evidence supporting the existence and terms of the Note, all of which was consistent with the copy of the Note and none of which was rebutted by credible evidence.  That evidence included the signed and executed Note Modification[58] and the Invoice provided by RFR to the Debtors prior to the Closing reflecting a "Deferred Fee" due of $150,000 secured by a note.[59]

In response to the substantial evidence presented by RFR in support of its entitlement to the $150,000 deferred fee, the Reorganized Debtor provided little evidence to rebut the validity of Claim No. 12.  Notably, it offered no testimony by any member or representative of the Debtors at the time of the 2019 closing to refute the testimony of Mr. Holland or any of the other evidence offered by RFR.  The only evidence offered by the Reorganized Debtor was the testimony of Mr. Wolf (who was a representative of Juniper at the time of the 2019 closing).  He testified only that he was not aware of the remaining fee due to RFR, did not see the Note or Invoice in the closing binder for

---

[57]   N.M. Stat. Ann. § 55-3-309(a).

[58]   Ex. R-19.

[59]   Ex. R-15; D.I. 307 at 24:3-13, 28:10-32:7, 41:16-45:20, 46:7-17, 46:25-47:21.

the 2019 loans, and the disbursement statement does not reflect any remaining fee due to RFR.[60]

The Court does not find Mr. Wolf's testimony sufficient to rebut the substantial evidence presented by RFR in support of its claims.  First, the Court finds that it is irrelevant whether Juniper or Fortress were aware of the Note at the time; it was an obligation of the Debtors which was corroborated by RFR and the Debtors' representative at the time.[61]  Second, the Reorganized Debtor failed to produce any evidence: (i) refuting the evidence of the existence of the Note;[62] (ii) explaining why the parties executed a Note Modification, if there was no Note;[63] (iii) refuting the evidence that RFR was entitled to a total fee of $880,000 for its work related to the 2019 financing;[64] or (iv) proving that RFR had received its full fee at the closing of the 2019 Loans (or at any other time).[65]

---

[60]    D.I. 307 at 72:5-11, 77:25-78:13 ("Q. What makes you think that [the Note] was secretive?  Because you didn't find out about it?  A. Yeah, I didn't see it in the closing binder.  I was unaware.  And to my knowledge, the Debtors – the rest of the Debtors were unaware.").  See also Ex. D-21.

[61]    See notes 28-29.

[62]    Id.  See also Ex. R-18.

[63]    See D.I. 307 at 38:17-23 ("Q.  Okay.  Have you ever participated . . . in the modification of a note that never existed in the first instance?  A.  I have not.  Q.  Have you ever heard of a party modifying a promissory note that didn't exist in the first instance?  A.  I have not.").

[64]    See notes 28-29, 34-37, 39-40.

[65]    Id.

Based on the evidence presented, the Court concludes that RFR has presented sufficient and credible evidence satisfying its burden of proving the validity of Claim No. 12. Consequently, the Court will overrule the Reorganized Debtor's objection and allow Claim No. 12 in full.

2.   Claim No. 20

In Claim No. 20, RFR seeks a fee totaling $745,742.96 based on the treatment of the Juniper and Fortress loans in the Debtors' confirmed Plan, arguing that the Plan constituted a refinancing of their debts entitling RFR to a 1% fee (the "Success Fee") under the terms of an agreement it had with the Debtors dated December 1, 2020 (the "Letter Agreement").[66]

The Reorganized Debtor objects to Claim No. 20 on three grounds: (a) the Letter Agreement had been terminated before the Plan was confirmed; (b) the treatment of the Juniper and Fortress secured debt under the Plan does not qualify as a "Financing" entitling RFR to a Success Fee under the terms of the Letter Agreement; and (c) RFR did not fulfill its obligations under the Letter Agreement to solicit and obtain financing for the Debtors, but instead impeded the Debtors' effort to refinance the Juniper and Fortress debt.

a.   Was the Letter Agreement Terminated?

---

[66]   Ex. D-2.  A copy of the Letter Agreement was attached to Claim No. 20.  Ex. R-55.

The Reorganized Debtor asserts that RFR is not entitled to a Success Fee because the Letter Agreement on which it relies was terminated, effective June 1, 2021, by a letter dated October 28, 2021.[67]

RFR argues that the Debtors' purported termination of the Letter Agreement was ineffective.  Other than the self-serving letter dated almost 5 months after the fact (and 7 days after RFR had filed its first proof of claim), RFR asserts that the Reorganized Debtor has produced no credible evidence that the Letter Agreement was in fact terminated effective June 1, 2021.

In addition, RFR contends that the Letter Agreement itself provides that if negotiations for a financing were ongoing as of June 1, 2021, the term of the Agreement would automatically continue until after those negotiations had concluded and the parties had agreed to a termination date.[68]  RFR presented evidence that negotiations with several parties did continue beyond June 1, 2021, and even until the Debtors' Plan was

---

[67]    Ex. D-3.

[68]    Section 2 of the Letter Agreement (executed on December 1, 2020) provides:
> The term of this Agreement (the "Agreement Term") shall be for six (6) months and shall commence on the execution date of the Agreement.  The Agreement Term shall be extended so long as RFR and [the Debtors] continue negotiations for Financing with bona fide Investors.  RFR and [the Debtors] agree that each must approve a termination date (the "Termination Date") when negotiations have been concluded.

Ex. D-2 at § 2.

18

confirmed.[69]  Therefore, RFR contends that, pursuant to section 2

of the Letter Agreement, the Letter Agreement continued in effect

until all negotiations were concluded and the parties agreed on

an acceptable termination date.[70]

Finally, RFR argues that, even if the Letter Agreement had

terminated, it would not affect RFR's entitlement to the Success

Fee.  Pursuant to section 9 of the Letter Agreement, RFR is

entitled to a Success Fee even after termination of the Letter

Agreement if a financing offer from any of the parties with whom

the Debtors were in discussions at the time of the termination is

accepted by the Debtors.[71]  On receiving the termination letter,

---

[69]    Mr. Pitts testified that negotiations with several prospects
continued after June 1, 2021.  D.I. 307 at 101:18-102:8, 134:11-
138:14; D.I. 308 at 48:25-49:23.  Mr. Wolf himself conceded that
negotiations with Mr. Blank and other lenders continued beyond
June 1, 2021.  D.I. 307 at 101:18-102:8.  At the October 19,
2021, confirmation hearing, the Debtors' representative testified
that negotiations with potential investors continued beyond the
alleged termination date of June 1, 2021.  Ex. R-48 at 12:2-5,
13:1-13, 14:19-24.  One of the prospective investor/financiers,
Mr. Blank, testified at the confirmation hearing that he was
prepared to bid at the foreclosure sale that Juniper had that
scheduled in May/June 2021 and that he was prepared to proceed
with his proposal to acquire the Debtors' equity post-petition.
Ex. R-48 at 93:16-97:5, 99:21-101:11; 105:1-9.

[70]    Ex. D-2 at § 2.

[71]    Section 9 of the Letter Agreement provides:
Within thirty (30) days after the Termination Date or
upon an earlier date selected by RFR, RFR shall furnish
to [the Debtors] a list setting forth the names of all
parties with whom RFR has had substantive discussions
for Financing prior to the Expiration Date for the
Property (the "Prospects List").  In the event that
[the Debtors] shall within twelve (12) months after the
Termination Date (the "Tail Period") accept a Financing

Mr. Pitts sent an email disputing the termination and attaching a Prospects List as required under section 9.[72]   The Prospects List included both Fortress and Juniper, the two lenders that ultimately provided financing when the Debtors' Chapter 11 Plan was consummated in October, 2021 (well within the 12 months provided in section 9).[73]

The Reorganized Debtor disagrees with RFR's interpretation of section 9 contending that it is non-sensical to suggest that the Letter Agreement could never be terminated unless RFR agreed to its termination.

The Court concludes that RFR is correct that the Debtors' purported termination of the Letter Agreement on October 28, 2021, was ineffective.  RFR presented credible, unrebutted evidence demonstrating that negotiations with potential lenders continued beyond June 1, 2021, thereby automatically extending the term of the Letter Agreement.[74]   Further, RFR presented

---

Offer from any party on the Prospects List, such Financing Offer shall be deemed to have been executed prior to the Termination Date and all the provisions of this Agreement shall be applicable thereto as if the Termination had not occurred.  RFR shall be entitled to any and all Success Fee(s) due under this Agreement, which shall be payable in full upon demand.
Ex. D-2 at § 9.

[72]    Exs. R-51 & R-52.

[73]    Ex. D-2 at § 9.

[74]    Ex. D-2 at § 2; Ex. R-48 at 12:2-5, 13:1-13, 14:19-25; D.I. 307 at 101:18-102:8, 134:11-138:14; D.I. 308 at 48:25-49:23.

credible testimony that it had not agreed to terminate the Letter
Agreement.[75]

The Reorganized Debtor presented no evidence to the
contrary.[76]

The Court concludes that the Reorganized Debtor's argument
that the interpretation of section 9 offered by RFR is non-
sensical because it would never allow termination of the Letter
Agreement is incorrect.  The Agreement would have terminated on
June 1 if there had not been ongoing negotiations with
prospective investors on that date.  It would also have
terminated after all prospects had ceased negotiations, on an
appropriate date that the parties selected.  At any rate, the
Court is obligated to enforce the language of the Letter
Agreement as agreed to by the parties and the unambiguous
language of section 2 provides that the term of the agreement was
extended past June 1, 2021, because negotiations with prospective
financiers were still ongoing at that time.  In addition, once
extended by section 2, section 9 required RFR's agreement to
terminate the Letter Agreement.

Further, the Court concludes that, even if the Letter
Agreement had terminated on June 1, 2021, RFR would still be

---

[75]   Ex. R-51; D.I. 307 at 140:6-146:21, 148:11-15.

[76]   Notably neither Mr. Norvet (the author of the termination
letter), nor any other principal of the Debtors during the time
at issue, testified.

entitled to a Success Fee if the Debtors accepted a Financing Offer within twelve months after the Termination Date from any party with whom RFR and the Debtors had been negotiating prior to termination.[77]  There is no dispute that the Debtors, with RFR's assistance, had been in negotiations with Juniper and Fortress prior to June 1, 2021,[78] and that the Debtors had accepted and consummated a deal with both of them when the Debtors' Plan was confirmed on October 21, 2021.[79]

Accordingly, the Court concludes that the Letter Agreement was not terminated and that, even if it was, the termination did not eliminate RFR's entitlement to a Success Fee for any refinancing provided by Juniper or Fortress under the confirmed Plan.[80]

---

[77]    Ex. D-2 at § 9.

[78]    D.I. 307 at 118:4-24, 121:23-122:21, 124:3-23, 138:7-14 150:23-152:8.  See also Exs. R-34, R-39, R-40, R-41.

[79]    Exs. D-9 & D-10.

[80]    The Reorganized Debtor also argues that no fee is due to RFR because Juniper was unaware at the time that the Debtors had agreed to pay RFR any fees related to the refinancing of their loans.  D.I. 307 at 79:23-81:7.  RFR presented testimony by Mr. Pitts, however, that Juniper and Fortress were aware of RFR's retention by the Debtors in 2020 because he was communicating with them in an effort to get them to refinance their loans.  Id. at 134:11-24, 137:21-138:14.  Again, the Court concludes that it is irrelevant whether Juniper or Fortress were aware that the Debtor had agreed to pay RFR a fee for its assistance in obtaining a refinance or replacement financing of the Juniper and Fortress loans.  That agreement was between the Debtors and RFR.

b.   <u>Was the Plan Restructuring a "Financing"?</u>

The Reorganized Debtor argues that under the terms of the Letter Agreement, the restructuring of the Fortress and the Juniper debt in the confirmed Plan was not a financing that entitled RFR to a Success Fee under the Letter Agreement.  The Reorganized Debtor relies on the last clause of the definition of "Financing" in the Letter Agreement, which states that it includes "any other vehicle by which borrowed money or credit is raised."[81]  Thus, the Reorganized Debtor argues that for a transaction to qualify as a "Financing," money must be borrowed or credit must be raised.  The Reorganized Debtor asserts that money was not borrowed and credit was not raised when Juniper converted its debt to equity or when Fortress amended its credit agreement under the Plan because neither provided any new money or credit to the Reorganized Debtor.[82]

---

[81]   Section 1 of the Letter Agreement provides in full: [The Debtors] hereby retain[] RFR on an exclusive basis during the Agreement Term (as defined below) to secure a commitment or commitments (the "Financing Commitments") for refinancing (the "Financing"), as defined herein, for the continued redevelopment of the Bishop's Lodge . . . .  For the purposes of this Agreement, Financing shall mean equity or debt, in whatever form, provided in any single transaction or a combination of transactions, including, but not limited to equity, secured or unsecured loans, secondary or subordinate financing, guarantees or other credit enhancements, mezzanine financing, bridge loans, lease or lease financing, <u>or any other vehicle by which borrowed money or credit is raised</u>. Ex. D-2 at § 1 (emphasis added).

[82]   <u>See</u> D.I. 307 at 67:15-24.

RFR responds that the Letter Agreement's definition of "Financing" was not limited to borrowing money or raising credit, but instead was exceedingly broad including "refinancing" and "equity or debt, in whatever form."[83]   Thus, RFR contends that the restructuring of the Fortress debt and the conversion of the Juniper debt to equity in the Plan fit squarely within that definition.   It notes that the Debtors' Disclosure Statement describes the treatment of the Juniper and Fortress debt under the Plan as "Restructuring Transactions" that restructured the obligations owed to Fortress through an amended credit agreement and restructured the obligations owed to Juniper by converting its debt to equity.[84]   This, it argues, clearly constituted a refinancing of the Juniper and Fortress debts.

In support of this argument, RFR contends that the Plan treatment of Juniper is essentially identical to the transaction proposed by the Blank Group, under which the Blank Group would have obtained equity in exchange for cash sufficient to pay off the Juniper debt.   RFR asserts that there is no dispute that the Blank Group proposal would qualify as a "Financing" under the Letter Agreement and there is no reason that Juniper's identical Plan treatment does not qualify as well.

---

[83]     Ex. D-2 at § 1.

[84]     Ex. R-63 at 2-9.

The Reorganized Debtor responds, however, that Juniper was merely exercising a remedy available to a secured creditor rather than engaging in a "Financing" or "Refinancing" transaction. It argues that the confirmation of the Plan was not a refinance or new financing but instead was effectively a foreclosure by Juniper on its security interest in the Senior Borrower's equity. It asserts that RFR was not entitled to a Success Fee on such a foreclosure.

RFR argues that while a secured lender typically has myriad rights and remedies under a loan agreement, it does not have the right to force a borrower to consummate a debt-for-equity swap. In fact, RFR notes that while Juniper had scheduled a foreclosure sale, it did not proceed with it because the Blank Group threatened to outbid it, thereby depriving Juniper of the ability to obtain the equity in the Senior Borrower.[85]  RFR also reiterates that the Fortress Plan treatment, whereby it agreed to the modification of its credit agreement, clearly constituted a refinancing rather than a foreclosure.[86]

The Reorganized Debtor argues nonetheless that its interpretation is bolstered by the language of the Letter Agreement which provides that any Success Fee is to be paid at

---

[85]     D.I. 307 at 62:10-65:5.

[86]     Ex. R-63 at 2-9.

closing from the initial proceeds of a Financing.[87]  Because the restructuring of the loans under the Plan resulted in no new money to the Debtors, the Reorganized Debtor asserts that it was impossible to pay RFR's Success Fee from the "proceeds" of that restructuring at closing.

RFR disagrees.  It contends that a formal closing on a loan is not the only type of closing required by the Letter Agreement.[88]  It argues that the Plan was, in fact, a refinancing of the Juniper and Fortress pre-petition loans and that its closing was on the effective date of the Plan which triggered the right to distributions according to the terms of the Plan.[89]

The Court concludes that RFR has satisfied its burden of proving that the restructuring of the Juniper and Fortress loans pursuant to the Debtors' Plan constituted a "Financing" under the terms of the Letter Agreement.

---

[87]    Section 6 of the Letter Agreement provides:
    If a Financing Commitment is executed by [the Debtors] under a Financing Offer, RFR shall be entitled to receive and be deemed to have earned a success fee (the "Success Fee") in an amount equal to; [sic] one percent (1.0%) of any and all Financing raised as senior debt, mezzanine or junior debt, and/or equity, all based on the aggregate amount(s) of such Financing Offer(s), (the "Success Fee").  <u>The Success Fee shall be payable immediately upon an actual closing from the initial proceeds with the funding of all or any portion of such Financing.</u>
Ex. D-2 at § 6 (emphasis added).

[88]    D.I. 308 at 34:22-36:14.

[89]    Ex. D-9 at Art. III.B.a.ii & Art. III.B.f.ii., Ex. D-10, Ex. D-11.

First, the Court rejects the Reorganized Debtor's assertion that Juniper would have received the same treatment that the Plan provided by foreclosing on its collateral.  The testimony of Mr. Wolf himself refutes this argument.  He testified that, although Juniper had scheduled a foreclosure sale, it continued that sale several times because the Blank Group threatened to overbid it at the sale, which would have precluded Juniper from obtaining the Debtors' equity that it ultimately received under the Plan.[90]

Second, the Court rejects the Reorganized Debtor's interpretation of the Letter Agreement that money must be borrowed, or credit raised, to qualify as a "Financing."  The Court concludes that the last phrase of section 1 ("or any other vehicle by which borrowed money or credit is raised") on which the Reorganized Debtor relies is merely a catchall provision designed to ensure that any examples not explicitly mentioned, but similar in nature to those mentioned, are still covered under the agreement.[91]  A catchall provision cannot be used to eliminate the preceding items specifically listed in an agreement.[92]

---

[90]    D.I. 307 at 62:10-65:5.

[91]    See Harrington v. Purdue Pharma, L.P., 144 S.Ct. 2071, 2082 (2024) ("the catchall must be interpreted in light of its surrounding context and read to 'embrace only objects similar in nature' to the specific examples preceding it.").

[92]    While the Supreme Court concluded in Purdue that a catchall phrase could not be interpreted to include objects that were not similar in nature to those previously listed, it did not hold (or

27

The Court concludes that the definition of "Financing" (which includes refinancing) clearly is sufficient to encompass the treatment of Fortress' secured claim in the Plan, under which Fortress' credit agreement was modified without any additional infusion of cash from Fortress. A refinancing is commonly understood to include the amendment of the terms of existing secured debt.[93]

Further, the Court easily concludes that the Plan's conversion of Juniper's debt to equity was a "Financing" under the Letter Agreement. "Equity . . . in whatever form" is expressly included in the Letter Agreement's definition of "Financing," with no caveat excluding a transaction involving a debt-for-equity swap.[94]

---

even suggest) that a catchall phrase could be used to limit the previously listed items. Id. at 2082-84. Furthermore, because there was not a comma between "any other vehicle" and "by which borrowed money or credit is raised" the last-antecedent rule provides that the latter phrase modifies only the former and not all of the other examples in the series. See, e.g., In re Enron Creditors Recovery Corp., 651 F.3d 329, 335-36 (2d Cir. 2011) (applying the last-antecedent rule to conclude that the phrase "commonly used in the securities trade" at the end of section 741(8) of the Code applied only to the immediately preceding phrase "or any other similar payment" in that section and not to all phrases in the series).

[93]    Refinancing, Black's Law Dictionary (12th ed. 2024) ("An exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan.").

[94]    Ex. D-2 at § 1 ("For the purposes of this Agreement, Financing shall mean equity or debt, in whatever form, provided in any single transaction or a combination of transactions, including, but not limited to equity, secured or unsecured loans,

Nor does the Court accept Juniper's assertion that there was no Financing or closing on a Financing.  The Court concludes that the confirmation of the Plan and the occurrence of the Effective Date (on which the refinancing of the Fortress loans and the conversion of the Juniper debt to equity occurred) was a closing sufficient to comply with the Letter Agreement.  Just as with a closing on a loan, the financing transactions under the terms of the Plan became effective and distributions to creditors and other parties occurred.

Consequently, the Court concludes that the treatment of Juniper and Fortress under the Plan was a "Financing" under the express terms of the Letter Agreement for which RFR would be eligible to receive a Success Fee.

c.   <u>Did RFR Solicit "Financing"?</u>

Finally, the Reorganized Debtor argues that, even if the treatment of the Juniper and Fortress loans under the Plan were a "Financing," RFR is not entitled to receive a Success Fee because RFR did not solicit the offer from them that was ultimately consummated in the Plan.

The Reorganized Debtor argues that the mere fact that RFR had an exclusive agreement with the Debtors does not entitle it

---

secondary or subordinate financing, guarantees or other credit enhancements, mezzanine financing, bridge loans, lease or lease financing, or any other vehicle by which borrowed money or credit is raised.") (emphasis added).  <u>See</u> <u>Financing</u>, <u>Black's Law</u> <u>Dictionary</u> (12th ed. 2024) (including "equity financing" in definition of "financing").

to a Success Fee without doing any work that was beneficial to
the Debtors.  Rather than provide any benefit to the Debtors, the
Reorganized Debtor contends that RFR's actions in soliciting and
negotiating an offer from the Blank Group was detrimental to the
Debtors costing them millions of dollars in lost revenues and
professional fees and resulting in their bankruptcy filing.[95]
The Reorganized Debtor also argues that the fact that the Court
itself rejected the Blank Group's offer proves that it provided
no benefit to the estate.[96]  Thus, the Reorganized Debtor
contends that RFR's efforts in seeking a Success Fee, despite
causing significant economic and reputational damage to the
Debtors, is "outrageous and repugnant."[97]

RFR responds that no provision of the Letter Agreement
required RFR to originate the financing offer that the Debtors
ultimately accepted.[98]  Rather, RFR presented evidence that its
job was to solicit as many financing offers as possible and
create a competitive atmosphere by which the Debtor could obtain
the best deal available.[99]  Mr. Pitts testified that RFR's job
was also to provide the Debtors with its expertise in negotiating

---

[95]    D.I. 307 at 66:12-21, 104:22-105:12.

[96]    Ex. R-48 at 142:20-143:17.

[97]    D.I. 307 at 98:17.

[98]    Ex. D-2.

[99]    Ex. D-2 at §§ 1, 3, 6.  See also D.I. 307 at 121:6-22; D.I.
308 at 15:14-16:19.

the terms of financing offers that were received.[100]  He also
testified that RFR performed those duties by sending out
solicitation material to many possible sources of financing with
which it had relationships, engaging with those who expressed an
interest in the opportunity, and assisting the Debtors in
analyzing and negotiating the terms of proposals received.[101]

Furthermore, RFR contends that, in fact, it did play an
active role in the Debtors' negotiations with Juniper and
Fortress.  Mr. Pitts testified that even before the execution of
the Letter Agreement, RFR had numerous discussions with Juniper
and Fortress regarding forbearance and the potential refinancing
of the 2019 Loans, but they were not interested in refinancing
and only wanted to be repaid in full.[102]  As a result, Mr. Pitts
testified that RFR approached other potential lenders and
investors to secure financing for the Debtors.[103]  During the
effective period of the Letter Agreement, he testified that RFR
engaged in substantive discussions regarding financing with at
least thirty interested parties on behalf of the Debtors, eight
of which expressed significant interest in providing financing to

---

[100]   D.I. 307 at 41:25-42:13, 42:24-43:3, 121:6-22; D.I. 308 at
15:14-16:19.

[101]   D.I. 308 at 15:14-16:19; D.I. 307 at 119:12-121:05.

[102]   D.I. 307 at 118:12-24, 121:3-112:21.

[103]   D.I. 308 at 15:14-16:19; D.I. 307 at 119:12-121:5.

the Debtors.[104]  Only after RFR cultivated substantial interest
from the Blank Group, did Juniper first indicate that it was
interested in refinancing the Mezzanine Loan.[105]  At the Debtors'
request, Mr. Pitts reviewed and provided comments and a mark-up
of the Juniper Term Sheet the Debtors received on February 9,
2021.[106]  Following Mr. Pitts' review, Juniper entered into a non-
binding term sheet with the Debtors on February 16, 2021.[107]

        RFR argues that, contrary to the Reorganized Debtors'
contention, the record establishes that its efforts created real
value for the Debtors.  The Debtors were delighted with the Blank
proposal which offered a better return than other proposed deals
(including Juniper's) and at a minimum provided an incentive for
Juniper to negotiate with the Debtors.[108]  Accordingly, RFR argues
that its efforts in soliciting the Blank Group's proposal created
significant value for the Debtors and created a competitive
bidding environment that ultimately led to the confirmation of
the Debtors' Plan.

        The Court concludes that the evidence presented by RFR
satisfies its burden of proving its entitlement to a Success Fee.

---

[104]    D.I. 307 at 118:4-121:5, 122:22-123:18.  See also Ex. R-52.

[105]    D.I. 307 at 118:12-24, 122:10-124:23.  See also Exs. R-28,
R-39, R-40, R-41, R-43.

[106]    D.I. 307 at 123:5-125:14.  See also Ex. R-34.

[107]    Ex. R-39.

[108]    Exs. R-40 & R-41.

Despite the Reorganized Debtor's contentions, the plain language of the Letter Agreement does not require that, to be entitled to a Success Fee, RFR must introduce the Debtors to the party that ultimately submits the successful Financing Offer.[109]  RFR was retained "on an exclusive basis" to assist the Debtors with soliciting offers from sources it had and helping the Debtors analyze any offer they received from any source.[110]

Further, the evidence demonstrates that RFR was intimately involved with negotiating with several prospective bidders, including the Blank Group and Juniper.[111]  The evidence shows that RFR was seeking proposals from both Juniper and Fortress many months before Juniper submitted its proposal on February 9, 2021, and that Mr. Pitts provided extensive comments to the Debtors to help them evaluate proposals they received.[112]  Mr. Wolf's testimony that his principal point of contact during the time at issue was not Mr. Pitts is not sufficient to overcome the evidence of RFR's involvement.  In addition, the Court finds that it is irrelevant because, as noted above, the Letter Agreement does not require that RFR originate or negotiate the terms of the ultimately successful proposal.

---

[109]    Ex. D-2.

[110]    Id.

[111]    See notes 101-07.

[112]    See notes 102, 105-07.

Further, the Court finds that RFR's efforts in analyzing and negotiating the Blank Group's proposal, rather than being detrimental to the Debtors, was beneficial and in fulfillment of its duties under the Letter Agreement.  While negotiations with Juniper were ongoing, the evidentiary record shows that it was not until the Debtors received the Blank proposal that Juniper presented the term sheet that the Debtors ultimately accepted and consummated.[113]

The Court discounts Mr. Wolf's testimony regarding the negative impact and lack of any benefit of the Blank Group proposal because it is tainted by his role with Juniper at the time, whose interest was in avoiding any competition.  The fact that the Court did not accept the Blank Group's proposal was not evidence that it was detrimental to the estate.  Rather, the Court rejected that proposal in part because the Debtors who had the exclusive right to propose a Plan had determined that the consensual restructuring of the Juniper and Fortress debt was the best deal in their business judgment.[114]  Further, Mr. Wolf's testimony is contradicted by credible evidence that the Debtors'

---

[113]   Id.

[114]   Ex. R-48 at 142:20-143:17 (after considering extensive evidence concerning the Blank Group's proposal and despite initial concerns that the Debtors' failure to consider that proposal might have been a breach of their fiduciary duty, the Court concluded that the Debtors had the exclusive right to propose a plan and had established that the Plan proposed by the Debtors was "the highest and best path forward for the [Debtors] to restructure [their] principal asset, the resort.").

management and members encouraged RFR's efforts to solicit competing bids and, particularly, the Blank Group's offer, in order to keep Juniper "honest" and interested in a restructuring of its debt.[115]

For all the above reasons, the Court concludes that (a) the Letter Agreement was not terminated; (b) the restructuring of the Juniper and Fortress secured debts under the Plan are "Financing" as defined in the Letter Agreement; and (c) RFR is entitled to a Success Fee under the Letter Agreement.  As a result, the Court will allow a Success Fee in the amount of 1% of the debt restructured in the Plan.

The Reorganized Debtor asserts finally that Claim No. 20 must be disallowed because it provides no detail as to how the amount asserted is calculated.[116]  Nor, it asserts, was any evidence presented at trial to support that calculation.

 The Court rejects that argument because it finds that the amount requested in Claim No. 20 is supported by the record.  The Plan and Disclosure Statement provide evidence that the Fortress Senior Debt of $40,979,543.53 and Juniper debt of $33,594,752.40 were restructured.[117]  The Court has found that RFR is entitled to a Success Fee under the Letter Agreement of 1% of that

---

[115]    Exs. R-28, R-40, R-41; D.I. 308 at 7:11-12:2.

[116]    Ex. R-55.

[117]    Ex. R-63 at 2-9, 15-27; Ex. D-9 at Art. III.B.a.ii & Art. III.B.f.ii.

restructured debt (totaling $74,574,295.93).  A simple
calculation results in an allowable claim of $745,742.96 which is
the amount that Claim No. 20 seeks.[118]


IV.   <u>CONCLUSION</u>

     For the forgoing reasons, the Court will overrule the
Reorganized Debtor's objection to RFR's Proof of Claim No. 12 and
will allow Proofs of Claim No. 12 and No. 20 in the amounts of
$175,000.00 and $745,742.96, respectively.

     An appropriate Order is attached.



Dated: September 12, 2024          BY THE COURT:


                                   Mary F. Walrath
                                   United States Bankruptcy Judge

---

[118]   Ex. D-2 at § 6.  It is appropriate to round up the .959 to
.96.  <u>See, e.g.,</u>  https://www.oxfordreference.com/display/
10.1093/acref/9780198845355.001.0001/acref-9780198845355-e-
2492?rskey=ig24I3&result=1.